Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman
Plaintiffs Pro Se herein
101 Jefferson Avenue
Westfield, New Jersey 07090
(908)-233-8278

_____X.

Dr. and Mrs. Stephen Francis and
Joyanne Louise Schoeman

        Plaintiffs Pro Se

              v.

New Jersey Superior Court Judge Ana C. Viscomi,
Aury Quezada, Esq., Middlesex Vicinage Superior
Court, Stephen O. Davis, Esq., Joseph Isola, Esq.,
James A. Vigliatti, Esq. New Jersey Summit
Municipal Court Judge John De Massie, New Jersey
Westfield Municipal Court Judge Paraq Patel,
New Jersey Summit Municipal Court Prosecutor
Michael J. Mitzner, New Jersey Westfield Municipal
Court Clerk, New Jersey Summit Municipal Court
Clerk, New Jersey Courts, State of New Jersey
John J. Paladino, Vicky Ney, Matthew Gonzalez
and Memorial Sloan Kettering Cancer Center

              Defendants

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2026 MAR -2 A 11:10

UNITED STATES DISTRICT COURT,
DISTRICT OF NEW JERSEY

DOCKET NMBER:_____

CIVIL ACTION

AMENDED COMPLAINT
=====================

JURY DEMAND

We, Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman, the Plaintiffs Pro Se, residing at 101 Jefferson Avenue, Westfield Township, Union County, New Jersey, complaining of the defendants, state as follows:

ONE: Dr. Schoeman is Jewish and is a Political Scientist, having earned his Ph. D. in Political Science from New York University, a retired Adjunct Professor of Business Law and as well American Government, and a long-retired attorney-at-law, of course herein acting ONLY in a PRO SE CAPACITY!

TWO: The defendants New Jersey Superior Court Judge Ana C. and her law clerk Aury Quezada in MID-L-8679-25 desecrated the YAHRZEITS of Plaintiff's Pro Se beloved and loving parents of the most blessed of precious memories by repeatedly many times refused to grant him and as well his beloved and loving wife, best friend, and soulmate the Plaintiff Pro Se Joyanne Louise Schoeman an adjournment respectively of the YAHRZEITS of his believing and loving parents Lee and Leonard Schoeman!

THREE: That the Plaintiff Pro Se Dr. Stephen Francis Schoeman was repeatedly forced, in effect, to beg for the aforementioned adjournments!

FOUR: That the aforementioned vital need to continue to request, in effect, to beg for the aforementioned adjournments caused Dr. Schoeman and as well Mrs. Schoeman trauma, pain and suffering, and emotional distress of the order of The Tort of the Intentional Infliction of Emotional Distress!

FIVE: Without basis in fact the defendant Summit Municipal Court Judge entered a libel against the Plaintiff Pro Se Dr. Stephen Francis Schoeman in State of New Jersey v. Dr. Stephen Francis Schoeman in his Order of Expungement, dated, Wednesday, September 10,2025 that he, Judge De John De Massie, despite the many respectful pleadings of both the Plaintiffs Pro Se therein and herein, Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman, abundantly has refused many times and still abundantly refuses at all to delete!

SIX: The defendants attorneys-at-law aforementioned have refused and continue to refuse to have the defendant Summit Municipal Court Judge John De Massie delete the aforementioned LIBEL!

SEVEN: That none of the defense counsel let alone defendant Summit Municipal Court Judge John De Massie nor defendant Westfield Municipal Court Judge Paraq Patel nor defendant Summit Municipal Court Prosecutor Michael J. Mitzner have as well ever, upon information and belief, requested the defendant Summit Municipal Court Judge John De Massie to delete the aforementioned LIBEL of his against the Plaintiffs Pro Se Dr. Stephen Francis Schoeman from the aforementioned Order of Expungement!

EIGHT: Defendant John J. Paladino at the time of his ban, infra, was the Pastor/Priest of St. Bartholomew the Apostle Parish, 2032 Westfield Avenue, Scotch Plains, Union County, New Jersey 07076.

NINE: Defendant John J. Paladino in violation of Roman Catholic canonical law and in violation of United States constitutional law instated a capricious and arbitrary ban such that the Plaintiff Pro Se Dr. Stephen Francis Schoeman was forbidden to attend any Mass and any social occasion at St. Bartholomew the Apostle Parish.

TEN: The Plaintiff Pro Se Dr. Stephen Francis Schoeman WITHOUT AT ALL giving up his Judaism willingly was baptized into the Roman Catholic Church.

ELEVEN: Many times ever so painfully repeated respectful requests, appeals, and demands for vacating the aforementioned ban proved, alas, fruitless!

TWELVE: The defendant then the aforementioned Pastor John J. Paladino institute yet a further ban such that the defendant the new Vicar Pastor Matthew Gonzalez of the aforementioned St. Bartholomew the Apostle Parish told the Plaintiffs Pro Se, Dr. Stephen Francis and Joyanne Louise Schoeman, after Mass outside the church building in response to Dr. Schoeman having had to ask Vicar Pastor Matthew Gonzalez why he was refusing to answer let alone acknowledge anything that Dr. Schoeman had or was writing to him replied that he was told so by former aforementioned defendant Pastor John J. Paladino.

THIRTEEN That there never had been as the Plaintiffs Pro Se was, in effect, a model parishioner, there never was, there never is at all the FUNDAMENT of any basis or bases at al for the aforementioned bans!

FOURTEEN: The then Pastor Vicky Ney of the First Presbyterian Church, Springfield, New Jersey intentionally violated her agreement to maintain strict confidentiality between herself and the Plaintiffs Pro Se Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman so as to violate their abundant right to Freedom of Religious Worship!

FIFTEEN: That likewise without any fundament of basis or bases at all and despite the many respectful requests, pleadings, appeals, demands of the Plaintiff Pro Se Dr. Stephen Francis

Schoeman the defendant Memorial Sloan Kettering Cancer Center were Dr. Schoeman was always, had always, ever was always, in effect, A MODEL PATIENT, has banned him and continued to ban him, and is it ever so outrageous, so despicable, so GROSSLY unjust as herein THE ISSUE is CANCER, continues STILL TO BAN him from any and all of the very excellent and world-famous services and procedures and methods and ways for CANCER TREATMENT, CANCER CURE, and, of course, ever so abundantly vastly important, CANCER TREATMENT OR TREATMENTS FOLLOW-UP OR FOLLOW UPS!

SIXTEEN: That by example, the Plaintiffs Pro Se Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman came to defendant Memorial Sloan Kettering Cancer Center's sprawling magnificent campus in Basking Ridge, New Jersey because of an elevation in Dr. Schoeman's PSA level after he had been treated FORTY-EIGHT (48) TIMES for his AGGRESSIVE PROSTATE CANCER and was never ever even seen let alone treated by any of the defendant Memorial Sloan Kettering Cancer Center staff there or anywhere else in the vat network or networks of defendant Memorial Sloan Kettering Cancer Center.

SEVENTEEN: That upon a series of respectful complaints of Plaintiff Pro Se Dr. Stephen Francis Schoeman to the Civil Rights Office of the Inspector-General of the United States Department of Health and Human Services under HIPAA. the aforementioned Cvil Rights Office in correspondence to the Plaintiff Pro Se Dr. Stephen Francis Schoeman advised and notified and informed him that it had found the defendant Memorial Sloan Kettering Cancer Center IN VIOLATION of HIPAA!

EIGHTEEN: That despite the many respectful appeals of the defendant Dr. Stephen Francis Schoeman that the aforementioned Memorial Sloan Kettering Cancer Center BAN be lifted, none of the executive officers, including the President and CEO Dr. Selwyn M. Vickers of the defendant Memorial Sloan Kettering Cancer Center as ever, ever, ever EVEN acknowledge any of the voluminous correspondent of Plaintiff Pro Se Dr. Stephen Francis Schoeman to each AND to all of them combined!
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
NINETEEN: That none of this, of course, is about a picnic in the park or a day at the beach by the Jersey Shore or a performance of the wold-famous Metropolitan Opera in their magnificent Metropolitan Opera House preceded by lusciously delightfully delicious dinner in the magnificent chandelier filled huge windowed deeply carpeted Grand Tier Restaurant of the Metropolitan Opera House! for THIS and only, of course, THIS is about Plaintiff Pro Se Dr. Stephen Francis Schoeman's PROSTATE CANCER!
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

TWENTY: That there never had been, there never was, there never is at all the fundament of any basis at all for the aforementioned bans!

---

WHEREFORE, the Plaintiffs Pro Se respectfully request judgment against the Defendants for damages, together with any attorney's fees, if applicable, costs of suit, and any other relief as the Court may deem proper.

February 22,2026. _____

DR. AND MRS. STEPHEN FRANCIS AND JOYANNE LOUISE SCHOEMAN
The Plaintiffs Pro Se herein

We certify that the dispute about which we are suing is not the subject of any other action pending in any other court other than the New Jersey Superior Court Middles County Vicinage or a pending arbitration proceeding to the best of our knowledge and belief. Also, to the best of our knowledge and belief no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties should hours be made a part of this lawsuit. In addition, we recognize our continuing obligation to file and serve on all parties and the Court an amended certification if there be a change in the facts stated in this original certification,

February 22,2026. _____ Joyanne Louise Schoeman

DR. AND MRS. STEPHEN FRANCIS AND JOYANNE LOUISE SCHOEMAN

JURY DEMAND.

The Plaintiffs Pro Se respectfully demand a jury on all of the triable issues of this complaint.

February 22,2026 _____ Joyanne Louise Schoeman

DR. AND MRS. STEPHEN FRANCIS AND JOYANNE LOUISE SCHOEMAN

======================================================================
LIST OF DEFENDANT OFFICIAL ADDRESSES
======================================================================

Judge Ana C/ Viscomi
Superior Cour
56 Paterson Street
New Brunswick, New Jersey 08901

Aury Quezada, Esq.
Law Clerk
Chambers of Judge Ana C. Viscomi
56 Paterson Street
New Brunswick. New Jersey 080-1

Stephen O. Davis, Esq.
15 Mountain Boulevard
Warren, New Jersey 07059

James A. Vigliotti, Esq.
783 Springfield Avenue
Summit, New Jersey 07901

Joseph Isola, Esq.
955 State Route 34
Matawan, New Jersey 07747

Judge John De Massie's
Summit Municipal Court
360 Elkwood Avenue
New Providence, New Jersey 07974

Judge Para Patel
Westfield Municipal Court
425 East Broad Street
Westfield, New Jersey 07090

Prosecutor Michal J. Mitzner
Prosecutor
Summit Municipal Court
360 Elkwood Avenue
New Providence, New Jersey 07975

Clerk
Westfield Municipal Court
425 East Broad Street
Westfield, New Jersey 07090

Clerk
Summit Municipal Court
360 Elkwood Avenue
New Providence . New Jersey 07090

New JerseyAttorney-General Jennifer Davenport
P. O. Box 080
25 Market Street
Trenton, New Jersey 08625

Pastor-Emeritus John J. Paladino
Queen of Peace Church
10 Franklin Place
North Arlington, New Jersey 07031

Pastor Vicky Ney
Margate Community Church
8900 Ventnor Avenue
Margate City, New Jersey 08402

Rector Matthew Gonzalez
Archdiocese of Newark
171 Clifton Avenue
Newark, New Jersey 071

Memorial Sloan Kettering Cancer Center
1275 York Avenue
New York, New York 10065

# DESECRATION OF YAHRZEIT: ANTI-SEMITIC ACT!!!

**From:** sschoeman@verizon.net (sschoeman@verizon.net)

**To:** aury.quezada@njcourts.gov; jaclyn.berry@njcourts.gov; aoc-acjcinfo.mbx@njcourts.gov

**Cc:** sdavis@newjerseylaw.net; jvigliotti@summitlawyers.net; jisola@cgajlaw.com

**Bcc:** macrina.carra@njcourts.gov; vtovar@westfieldnj.gov; steven.budelman@njcourts.gov; jason.saunders@njcourts.gov

**Date:** Friday, February 20, 2026, 05:30 PM EST

Friday evening, THE JEWISH SABBATH, February 20,2026
=====================================================
FROM: Mrs. Joyanne Louise Schoeman

TO: Judge Ana C. Viscomi
    her law clerk Aury Quezada, Esq.

You each have desecrated my JEWISH husband Steve's YAHRZEITS of his beloved and loving
parents of the most blessed of memories imaginable!

You have engaged in THE TORT OF THE INTENTIONAL INFLICTION OF EMOTIONAL STRESS

You have driven him well more than a dozen times to have TO BEG, and he is NO beggar, that you
postpone your motion hearing to other days!

You have caused my JEWISH husband to do what No Jew on Earth should ever have to do and that is to beg to have the right which is absolute under the First Amendment to observe religiously and in every other way the DEATHS OF PARENTS!

You have made my JEWISH husband Steve become ill to the point that he takes to bud, has very serious nightmares, and loses his usual hearty atmosphere!

You have also me my JEWISH husband Steve's wife ME ill and have likewise engaged in THE TORT OF THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS!

You have brought EXTREME SADNESS to this once happy home we share with our beloved and loving and ever so very hugely enormously adorable miniature apricot poodle PIERRE HENRI!

You have so disoriented us, disappointed us, frightened us, tormented us, tortured us!

You have even made it a very serious QUESTION OF HEALTH as to the respective LIFE-TAKING DISEAS my JEWISH husband Steve and I have, each of us of very advanced age,
JEWISH Steve nearly 84, I nearly 80!!!!!!

And to top it off if all this be not enough, not one word of sympathy from either of you let alone from the other so called "guardians" of the law-defense counsel, that is-and their client defendants!

And we are appalled!
And we are astonished!
And we are dismayed!

And we thus it would seem have to be forced to go into Federal court!
And we shall if at all necessary!
And we shall prevail though we are not presumption we know GOD IS ON OUR SIDE as he as always throughout history honors and adores and loves his CHOSEN PEOPLE!

With what little respect is left,

Mrs. Joyanne Louise Schoeman
the beloved and loving husband, best friend, soulmate, co-plaintiff of my tortured and tormented and pained beyond belief beloved and loving JEWISH husband, best friend, soulmate, and co-plaintiff, we, of course, the beloved and loving MOMMY and DADDY of our beloved and loving and ever so hugely enormously adorable miniature apricot poodle PIERRE HENRI

And as to Decency, where art thee in these matters stated above?
Where art thee indeed?
Where are thee in fact?


cc: Civil Rights Division of the United States Department of Justice, 18 U.S.C. 242
===========================================================

OL Mail - CAPRICE is no replacement for law! VOLTAIRE

Case 2:26-cv-01827-MCA-JSA    Document 5    Filed 03/02/26    Page 8 of 59 PageID: 44

2/22/26, 11:17 AM

# CAPRICE is no replacement for law! VOLTAIRE

**From:** sschoeman@verizon.net (sschoeman@verizon.net)

**To:** aury.quezada@njcourts.gov; jaclyn.berry@njcourts.gov

**Cc:** sdavis@newjerseylaw.net; jvigliotti@summitlawyers.net; jisola@cgajlaw.com

**Bcc:** aoc-acjcinfo.mbx@njcourts.gov; vtovar@westfieldnj.gov; macrina.carra@njcourts.gov

**Date:** Sunday, February 22, 2026, 11:17 AM EST


County of Middlesex, Superior Court, Law Division, MID-L-8679-25

-----------------------------------------------------------------------------------------------

CAPRICE is no replacement for law! VOLTAIRE!

(C) Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman
Plaintiffs Pro Se herein
Sunday, February 22,2026
FOR WORLD-WIDE DISTRIBUTION
================================


CAPRICE is no replacement for law. VOLTAIRE, "Philosophical Dictionary"

This Court-of-NO LAW is not law!
These Defense Counsel of not law either!
These Defendants assuredly so as well are not law also!

For at issue is the lawless of a judge, defendant Judge John De Massie
who has so grossly dishonored his Summit, New Jersey, Municipal Court
as have the other two defendants: Westfield, New Jersey, Municipal Court
Judge Paraq Patel and New Jersey attorney-AGAINST THE LAW,
James A. Vigliotti our former "defense" counsel whom we had to dismiss
forthright, forthwith, assuredly so, because of his refusal ABSOLUTE even
to speak to this DISHONORABLE (for reasons obvious and herein and
heretofore stated so many almost innumerable times) Judge and tell him
straight out, "Your Honor, you have LIBELED Dr. Schoeman in your
Order of Expungement, dated, Wednesday, September 10,2025!"

But who else has done a thing at all?

Neither the defense counsel nor the judge, Superior Court Judge
Ana C. Viscomi who has delayed and delayed and delayed even to
acknowledge OUR MOTION FOR SUMMARY JUDGMENT let alone,
alas, act on it and her law clerk the New Jersey attorney-at-law one

Aury Quezada!

They take the view, all or most all of them or nearly all of them, and to use the famous expression, please do pardon the language,

"Don't give a shit" that they each in their own mean miserable, yes, evil ways and means have DESTROYED the good reputation, the good name, the high esteems held by Plaintiff Pro Se Dr. Stephen Francis Schoeman ALL HIS NEARLY 84 YEARS OF LIFE in this corrupt. and corrupting and ever so very enormously hugely CORRUPTIBLE WORLD!

They each and all STAND BACK!
REFUSE TO BUDGE!
Let THAT atrociously evil LIBEL simmer and still and spread yet further ITS TOXIC POISONS for which scientists, biologists, physicians, clinical researches have not and never can find a cure!

The ONLY cure lies IN GOD! Isaiah 33:22!!!!!!!!!!!
=====================================

We are astonished but we are not astonished for, and with all due respect still a little remaining, COMPETENCE and HONOR and INTEGRITY and SENSE OF JUSTICE let alone DECENCY let all

   THE TRUTH AND THE WHOLE TRUTH AND NOTHING BUT THE TRUTH
   is most nearly often forced to ride the back of an angry tiger, in this case,
   Judge, Defense Counsel with their evil practices of TRICKERY and
   OBFUSCATION, Frankel, ibid, 1031-1059, and, of course, without any
   reasonable and OBJECTIVE question supreme the DEFENDANTS herein!
   =============================================================

Oh, yes, of course, are appeal is to God, not to Man, as The Bible which, of course, is God's own words, tells us full on! ISAIAH 33:22

We live by and only by ISAIAH 33:22

As all of YOUR should too! ISAIAH 33;22

And as well:

DEUTERONOMY 16:20
AMOS 5:24
MICAH 6:8

Shall we or shall we have to or must we have to LIST MORE?

'L Mail - INNOCENCE of JEWISH Dr. Schoeman

# INNOCENCE of JEWISH Dr. Schoeman

From:  sschoeman@verizon.net (sschoeman@verizon.net)

To:     cwestrick@carellabyrne.com; sdavis@newjerseylaw.net; jisola@cgajlaw.com; jvigliotti@summitlawyers.net

Cc:     macrina.carra@njcourts.gov; vtovar@westfieldnj.gov

Bcc:    aury.quezada@njcourts.gov; aoc-acjcinfo.mbx@njcourts.gov

Date:   Monday, February 23, 2026, 04:56 AM EST

Superior Court, Middlesex County, Law Division, MID-L8679-25
Superior Court, Union County, Law Division, UNN-L-4636-25
UNITED STATES DISTRICT COURT, DISTRICT OF NEW JERSEY
(The docket number on AMENDED COMPLAINT is PENDING!)
=======================================================

Sunday, February 22, 2026, the day of the big bad blizzard but there
is nothing quite the threat posed to CIVILIZATION than the untruths,
that is the LIBELS and too the SLANDERS of all of you, each of you,
every one of you defending and protecting and support them OR
looking the other way in what may even, and most respectfully by
us, be considered, well, "indifference" of a kind!
=======================================================
We, you the Defense counsel, you their defendant clients, you too
the judges, you the prosecutors

HAD NEED TO ESTABLISH the INNOCENCE of JEWISH
Dr. Stephen Francis Schoeman, the Plaintiff Pro Se herein!

But, sadly, most unfortunately as in ILL-FATED, ever so
very enormously hugely gigantically tragically as to his
good name, his good reputation, his high estate, that is
his PERFECT RECORD in the eyes, ears, and mind of
THE LAW, all his nearly EIGHT-FOUR years and now,
alas, tragically so, in the DARKENING DUSK of the
DYING LIGHT of his full and now, alas, ancient years,
YOU EACH HAVE failed to do what WE the Plaintiffs Pro Se,
JEWISH Dr. and Mrs. Stephen Francis and Joyanne Louise
Schoeman had established a very long time ago, relative
to the speed of passage of both History and Time,

THAT JEWISH DR. SCHOEMAN IS COMPLETELY
AND TOTALLY AND THOROUGHLY INNOCENT of
those LIBELS you spread around, you defend, you support,
you protect with all your LEGALISTIC MIGHT all the while

THE JUDGES sit back to await your lies, your deceptions, your deceits, your dissembling, your tricks, and your obfuscations!

========================================

(See, please do, United States District Court for the Southern District of New York Judge Marvin E. Frankel's "The Search for Truth: An Umperial View", University of Pennsylvania Law Review, Volume 123, May 1975, Number 5, Pages 1031-1059

========================================

You each, all of you, everyone of you have tormented, tortured, disgraced, defamed in LIBEL and in SLANDER, grossly abused, unjustly dismissed his appeals for JUSTICE and those too of his beloved and loving wife, best friend, soulmate, and co-plaintiff Joyanne Louise Schoeman, they the beloved and loving MOMMY and DADDY of their beloved and loving ever so enormously adorable miniature apricot poolde PIERRE HENRI!

AND IN THE PROCESS broken, violated, dismembered most every law and rule and principle and ideal, and yes, dream, in the book, so to speak!

DUE PROCESS OF LAW
EQUAL PROTECTION OF THE LAW
DUE PROCESS PROPER NOTIFICATION
FREEDOM OF SPEECH
FREEDOM OF RELIGIOUS FAITH
CIVIL RIGHTS ACT OF 1964
HIPPA (in as to some of you)
DEFAMATION: LIBEL AND SLANDER
DEFAMATION PER SE
UNITED NATIONS UNIVERSAL DECLARATION OF HUMAN RIGHTS
UNITED NATIONS INTERNATIONAL COVENANT OF CIVIL AND POLITICAL RIGHTS
 (The law of the United States of America under the Constitution's world-famous
  TREATY CLAUSE as it had both been ratified by the Senate and signed into law
  by, so very enormously sad to say, late great President Jimmy Carter, a true man of
  peace, a most distinguished along with his beloved and loving, and too ever so very
  enormously said to say First Lady Roselyn Carter, he, of course NOBEL PEACE
  PRIZE LAUREATE that he as a great HUMANITARIAN earned and did not, of course,
  steal out of the hands of the Venezuelan Nobel Peace Prize Laureate who was strongly
  pressured to turn her WELL EARNED gold medal over to what's his name!)

You have EACH thus VIOLATED Rule 1.3 of the Rules of Professional Conduct of the State of New Jersey and so THOSE OF YOU who are "attorneys-AT-LAW" must now

Case 2:26-cv-01827-MCA-JSA    Document 5    Filed 03/02/26    Page 12 of 59 PageID: 48

be immediately referred to the OFFICE OF ATTORNEY ETHICS and you the JUDGES to THE ADVISORY COMMITTEE OF JUDICIAL CONDUCT.

AND FURTHERMORE, OF EQUAL IF NOT OF MORE THAN EQUAL IMPORTANCE, these matters must be decided IN FAVOR OF JEWISH DR. AND MRS. STEPHEN FRANCIS AND JOYANNE LOUISE SCHOEMAN!

AND under THE WORLD-FAMOUS EQUITABLE DOCTRINE OF CLEAN HANDS each of you, so to speak, SENT TO A NUNNERY!

MOST respectfully as to LADY LIBERTY, LADY JUSTICE, and THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH so help us GOD!

JEWISH Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman
101 Jefferson Avenue
Westfield, New Jersey 07090
(908) 233-8278 AND (908) 654-4144

# ASIANA FLIGHT 214: MUST ALWYAS LOOK FOR THE TRUTH!

From:  sschoeman@verizon.net (sschoeman@verizon.net)

To:      aury.quezada@njcourts.gov; jaclyn.berry@njcourts.gov; aoc-acjcinfo.mbx@njcourts.gov

Cc:      sdavis@newjerseylaw.net; jisola@cgajlaw.com; jvigliotti@summitlawyers.net

Bcc:    cwestrick@carellabyrne.com; steven.budelman@njcourts.gov; jason.saunders@njcourts.gov

Date:   Monday, February 23, 2026, 09:30 AM EST


ASIANA FLIGHT 214 ended in disaster because the pilots were looking
at false readings in their instruments and not at the ground!

As with them, so with the defense counsel and their defendant clients,
the FUNDAMENT is that they MUST always look for THE TRUTH
and not at their legalistic devices: motions to dismiss, briefs,
various and sundry argumentations, mind-set, WHATEVER!

For then THE TRUTH, THE WHOLE TRUTH, AND NOTHING
BUT THE TRUTH IS NOT EXPOSED!

Whaat is exposed is a slanted, distorted, most always SUBJECTIVE
view of TRUE REALITY, that is, OBJECTIVE REALITIES!

What is at work, of course, is FREUD's famous PLEASE
PRINCIPLE" (Beyond The Pleasure Principle", published in 1920)
in which is so very precisely keenly posited as follows:

> Human beings tend ONLY to want pleasure and it must
> be "constant" pleasure and so anything at all that gives them
> UNPLEASURE is automatically rejected by "the mental
> apparatus" in order to avoid the necessitated
> DISPLEASURES that would otherwise ENSUE!

There, these defense counsel and their defendant clients cannot,
and, of course, they are far from alone in this mental or rather
psychological process-THE PLEASURE PRINCIPLE-cannot
afford or tolerate or ACCEPT anything AT ALL from the
Plaintiffs Pro Se herein, of course,

  Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman

THAT in any way does not agree with or contradicts or conflicts
with the thus SUBJECTIVE realties of the defense counsel and
their client defendants!

OR even with those of the sitting or call her presiding judge or judges, and the Plaintiffs Pro Se have to say this but say this with utmost due respect!

And so it is that the ancient Greeks were ever so wise as, of course, in other matters as well to put the priestess through rigorous training-STRICT PURIFICATION RITUALS- to ensure as much as humanly possible that the now DELPHIC ORACLE be, that's, right PURE in Judgment!

And so when defense counsel and their defense clients defend and support and protect THE LIBELS against JEWISH Plaintiff Pro Se, Dr. Stephen Francis Schoeman despite or perhaps even in spite of the many pleadings of his beloved and loving wife, best friend, soulmate, and co-plaintiff Joy and him, they beloved and loving MOMMY and DADDY of their beloved and loving and ever so very enormously hugely magnificently adorable miniature poodle PIERRE HENRI we are not at all in the land of Justice, the land of HEALING, the land of TRUTH SEARING but in that terrible, horrible, frighting land of COMBAT ZONE!

> Chief Justice Warren E. Burger, Annual State of the Judiciary Message, American Bar Association, Winter convention, Las Vegas, February 12,1984 where he said lawyers MUST be "healers of conflicts", not combatants!

> United States District Court of Southern New York, Judge Marvin E. Frankel, "The Search for Truth: An Umperial View", University of Pennsylvania Law Review, Volume 123, May 1975, Number 5, Pages 1031-1059

> DEUTERONOMY 16:20,

> "Justice, justice along shall you pursue"
> ===============================

Respectfully as to the world-famous American JUDICIAL PROCESS, LADY LIBERTY, LADY JUSTICE, and, of course, at the very nub herein,

THE TRUTH, THE WHOLE TRUTH, AND
NOTHING BUT THE TRUTH so help us
God!

JEWISH Dr. Stephen Francis and
Joyanne Louise Schoeman
101 Jefferson Avenue
Westfield, New Jersey 07090
(908) 233-8278

# Descent Below Visual Glidepath and Impact With Seawall
## Asiana Airlines Flight 214
## Boeing 777-200ER, HL7742
## San Francisco, California
## July 6, 2013



**Accident Report**

NTSB/AAR-14/01
PB2014-105984



**National
Transportation
Safety Board**

NTSB/AAR-14/01
PB2014-105984
Notation 8518
Adopted June 24, 2014

# Aircraft Accident Report

Descent Below Visual Glidepath and Impact With Seawall

Asiana Airlines Flight 214

Boeing 777-200ER, HL7742

San Francisco, California

July 6, 2013



**National Transportation Safety Board**

490 L'Enfant Plaza, SW
Washington, D.C. 20594

National Transportation Safety Board. 2014. *Descent Below Visual Glidepath and Impact With Seawall, Asiana Airlines Flight 214, Boeing 777-200ER, HL7742, San Francisco, California, July 6, 2013.* Aircraft Accident Report NTSB/AAR-14/01. Washington, DC.

**Abstract:** This report discusses the July 6, 2013, accident involving a Boeing 777-200ER, Korean registration HL7742, operating as Asiana Airlines flight 214, which was on approach to runway 28L when it struck a seawall at San Francisco International Airport (SFO), San Francisco, California. Three of the 291 passengers were fatally injured; 40 passengers, 8 of the 12 flight attendants, and 1 of the 4 flight crewmembers received serious injuries. The other 248 passengers, 4 flight attendants, and 3 flight crewmembers received minor injuries or were not injured. The airplane was destroyed.

Safety issues relate to the need for Asiana pilots to adhere to standard operating procedures regarding callouts; reduced design complexity and enhanced training on the airplane's autoflight system; opportunity at Asiana for new instructors to supervise trainee pilots in operational service during instructor training; guidance for Asiana pilots on use of flight directors during a visual approach; more manual flight for Asiana pilots; a context-dependent low energy alert; research that examines the injury potential from significant lateral forces in airplane crashes and the mechanism that produces high thoracic spinal injuries; evaluation of the adequacy of slide/raft inertia load certification testing; aircraft rescue and firefighting (ARFF) training for officers in command of an aircraft accident response; guidance on when to use a skin-piercing nozzle on a burning airplane fuselage; integration of the medical supply buses at SFO into the airport's preparation drills; guidance or protocols for ensuring the safety of passengers and crew at risk of a vehicle strike during ARFF operations; requirements for ARFF staffing; improvements in SFO emergency communications; and increased Federal Aviation Administration (FAA) oversight of SFO's emergency procedures manual. Safety recommendations are addressed to the FAA, Asiana Airlines, Boeing, the ARFF Working Group, and the City of San Francisco.

The National Transportation Safety Board (NTSB) is an independent federal agency dedicated to promoting aviation, railroad, highway, marine, and pipeline safety. Established in 1967, the agency is mandated by Congress through the Independent Safety Board Act of 1974 to investigate transportation accidents, determine the probable causes of the accidents, issue safety recommendations, study transportation safety issues, and evaluate the safety effectiveness of government agencies involved in transportation. The NTSB makes public its actions and decisions through accident reports, safety studies, special investigation reports, safety recommendations, and statistical reviews.

Recent publications are available in their entirety on the Internet at http://www.ntsb.gov. Other information about available publications also may be obtained from the website or by contacting:

National Transportation Safety Board
Records Management Division, CIO-40
490 L'Enfant Plaza, SW
Washington, DC 20594
(800) 877-6799 or (202) 314-6551

NTSB publications may be purchased from the National Technical Information Service. To purchase this publication, order product number PB2014-105984 from:

National Technical Information Service
5285 Port Royal Road
Springfield, Virginia 22161
(800) 553-6847 or (703) 605-6000
http://www.ntis.gov/

The Independent Safety Board Act, as codified at 49 U.S.C. Section 1154(b), precludes the admission into evidence or use of any part of an NTSB report related to an incident or accident in a civil action for damages resulting from a matter mentioned in the report.

UNITED STATES DISTRICT COURT, DISTRICT OF NEW JERSEY, docket number PENDING
========================================================================

EXHBIT marked "REQUEST", dated, Monday, February 23,2026
+++++++++++++++++++++++++++++++++++++++++++++++++++++++

MR. QUEZADA, LAW CLERK TO SUPERIOR COURT JUDGE ANA C. VISCOMI

JUDGE VISCOMI, YOU, AND ALL THE DEFENSE COUNSEL

ARE

DEFENDANTS IN YOUR VERY OWN COURT, THE SUPERIOR COURT OF NEW JERSEY

BY OUR AMENDED COMPLAINT!
+++++++++++++++++++++

AND

FURTHERMORE,

EACH AND EVERY ONE OF YOU

IS

A DEFENDANT IN OUR COMPLAINT FILED WITH

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

HENCE
++++++

THE MOTION HEARING SCHEDULE FOR THIS WEEK, FEBRUARY 26,2026 CANNOT AT ALL

TAKE PLACE

AND MAY NOT AT ALL TAKE PLACE

UNDER

THE CODE OF JUDICIAL CONDUCT

AND

UNDER

THE RULES OF PROFESSIONAL CONDUCT

NOR MAY JUDGE VISCOMI TO OTHER THAN IMMEDIATELY TO RECUSE HERSELF

VIOLATION OF DR. SCHOEMAN'S AND MINE EVER SO POLITE AND RESPECTFUL AJD JU

JUST REQUEST

AND YET FURTHER LEGAL ACTION UPON THE ADVICE OF COUNSEL SHALL BE TAKEN

FORTHWITH!

# BLIZZARD: DOOR TO TRUTH

From: sschoeman@verizon.net (sschoeman@verizon.net)

To: sdavis@newjerseylaw.net; jvigliotti@summitlawyers.net; jisola@cgajlaw.com

Cc: aury.quezada@njcourts.gov; jaclyn.berry@njcourts.gov

Bcc: aoc-acjcinfo.mbx@njcourts.gov; steven.budelman@njcourts.gov; jason.saunders@njcourts.gov

Date: Monday, February 23, 2026, 10:50 PM EST


FROM: JEWISH Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman
    Plaintiffs Pro Se, Superior Court, Middlesex County, Law Division
    MID-L-8679-25

TO: Superior Court Judge Ana C. Viscomi

DATED: very late Monday evening, February 23,2026

NOT EX PARTE: ALL DEFENDNTS E-MAILED!

================================================================
THE BIG GREAT HORRIBLE HORRIFYING BLIZZARD: AND THE DOOR TO TRUTH!
================================================================

As Dr. Schoeman told his beloved wife Joy, "We cannot open the door to offer the
landscapers removing the vast layers of snow coffee!"

But, then, Dr. Schoeman thought, reflected, and added, "But the defense lawyers
can't open THE DOOR TO TRUTH!'"

And, yes, then can't what with their TRICKS and their OBFUSCATIONS and their
OTHER TOOLS OF THE TRADE! (The Judge Frankel article they never ever read!)

And the Judge, with all due respect to the JUDICIAL PROCESS, is at best
indifferent to THE TRUTH for she has yet even to consider our
MOTION FOR SUMMARY JUDGMENT submitted to her Court-of-Law some
time ago!

And added to all this the alleged ANTI-SEMITISM in FORCING JEWISH
Dr. Stephen Francis Schoeman, Co-Plaintiff Pro Se herein, to have literally
TO BEG for adjournments of her motion hearings to days not those of
his beloved and loving JEWISH parents!
                    +++++++

NOW she, her law clerk, all the defendants are DEFENDANTS in the

SUPERIOR COURT OF NEW JERSEY

and

DEFENDANTS IN OUR COMPLAINT IN THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY!

But, alas, she does not relent, and continues on with her NOW
for reason herein her HEARING MOTION she WITHOUT our
at all permission scheduled for FEBRUARY 26,2026

AS IF

Neither the CODE OF JUDICIAL CONDUCT nor the
RULES OF PROFESSIONAL CONDUCT nor the
UNITED STATES CONSTITUTION nor even DECENCY
matter at all to her!

cc: Civil Rights Division, United States Department of Justice
     Office of Attorney Ethics
     The Advisory Board on Judicial Conduct

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
(Docket Number PENDING completion of filing)

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
New Jersey Superior Court Judge Ana C. Viscomi et al

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
Cardinal Tobin et al

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
Dr. Derek Santiago et al

_____

EXHIBIT, Tuesday, February 24,2026 marked,

" United States District Court for the Southern District of New York
Judge Marvin E. Frankel, "The Search for Truth: An Umperial View".
University of Pennsylvania Law Review" Volume 123, May 1975,
Number 5, Pages 1031-1059"
=======================================================

COMPLETE VALID COMPY THEREOF
===============================

As to the Defense, the Protection, the Support of the Libel
against the good name, against the good reputation, against
the high esteem all heard by the Plaintiff Pro Se herein,
Dr. Stephen Francis Schoeman all his nearly, alas, so,
nearly EIGHT-FOUR YEARS OF LIFE, now tragically so, in
THE DARKENING DUSK OF LIFE and what with his several
LIFE-TAKING DISEASES that is fully fulling maintained to beat
the band, so to speak, to a fault, so to speak, in excess evil,
so to speak, by the DEFENSE COUNSEL herein and their
DEFENDANT CLIENTS herein and which as been and, alas,
also tragically so, is causing extreme damage to the health
not only of Dr. Schoeman but of his co-plaintiff his beloved and
loving wife, best friend, soulmate, and co-plaintiff Mrs. Joyanne
Louise Schoeman, each the extraordinarily proud parent of their
beloved and loving and ever so very extremely tremendously
gigantically adorable miniautre apricot poodle PIERRE HENRI
as has been caused, and as is being causes, alas, ever so
tragically so, by the torment, the torture, the legalistic means
and the legalistic ways of these very same DEFENSE ATTORNEYS
and, of course as well, their DEFENDANT CLIENTS herein and
therein, respectively:
====================
===========
MID-L-8679-25 re Viscomi et al
UNN-L-4376-25 re Tobin et al
UNN-L-4961-25 re Santiago et al
=============================

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
(Docket Number PENDING completion of filing)

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
New Jersey Superior Court Judge Ana C. Viscomi et al

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
Cardinal Tobin et al

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
Dr. Derek Santiago et al

_____

EXHIBIT, Tuesday, February 24,2026 marked,

" United States District Court for the Southern District of New York
Judge Marvin E. Frankel, "The Search for Truth: An Umperial View".
University of Pennsylvania Law Review" Volume 123, May 1975,
Number 5, Pages 1031-1059"
===========================================================

COMPLETE VALID COMPY THEREOF
=================================

As to the Defense, the Protection, the Support of the Libel
against the good name, against the good reputation, against
the high esteem all heard by the Plaintiff Pro Se herein,
Dr. Stephen Francis Schoeman all his nearly, alas, so,
nearly EIGHT-FOUR YEARS OF LIFE, now tragically so, in
THE DARKENING DUSK OF LIFE and what with his several
LIFE-TAKING DISEASES that is fully fulling maintained to beat
the band, so to speak, to a fault, so to speak, in excess evil,
so to speak, by the DEFENSE COUNSEL herein and their
DEFENDANT CLIENTS herein and which as been and, alas,
also tragically so, is causing extreme damage to the health
not only of Dr. Schoeman but of his co-plaintiff his beloved and
loving wife, best friend, soulmate, and co-plaintiff Mrs. Joyanne
Louise Schoeman, each the extraordinarily proud parent of their
beloved and loving and ever so very extremely tremendously
gigantically adorable miniautre apricot poodle PIERRE HENRI
as has been caused, and as is being causes, alas, ever so
tragically so, by the torment, the torture, the legalistic means
and the legalistic ways of these very same DEFENSE ATTORNEYS
and, of course as well, their DEFENDANT CLIENTS herein and
therein, respectively:
====================

===========
MID-L-8679-25 re Viscomi et al
UNN-L-4376-25 re Tobin et al
UNN-L-4961-25 re Santiago et al
==============================

# University of Pennsylvania
# Law Review

FOUNDED 1852

**Formerly**
**American Law Register**

| VOLUME 123 | MAY 1975 | NUMBER 5 |

## THE SEARCH FOR TRUTH: AN UMPIREAL VIEW*

MARVIN E. FRANKEL†

What I have written for the thirty-first Benjamin N. Cardozo Lecture makes no pretense to be polished or finished wisdom. In the words of an imposingly great predecessor, Judge Charles E. Clark, beginning the fifth of these lectures in 1945, I propose "to suggest problems and raise doubts, rather than to resolve confusion; to disturb thought, rather than to dispense legal or moral truth."[1] Probably more rash than Judge Clark, I do not experience "trepidation"[2] for offering questions rather than answers; honest exploration in any province of the law is surely no dishonor to the questing spirit of Judge Cardozo.

My questions, briefly stated, have to do with some imperfections in our adversary system. My purposes are to recall some perennial problems, to touch upon one or two familiar ideas for improvement, and to sketch some tentative lines along which efforts to reform our law might proceed.

Because I plan to focus on recurrent criticisms of the activity to which my professional life is and has been devoted, I find it

---

* 31st Annual Benjamin N. Cardozo Lecture, delivered before the Association of the Bar of the City of New York, December 16, 1974.

Copyright © 1974 by Marvin E. Frankel.

† District Judge, United States District Court for the Southern District of New York. A.B. 1943, Queens College; LL.B. 1949, Columbia University.

[1] Clark, *State Law in the Federal Courts: The Brooding Omnipresence of Erie v. Tompkins*, 55 YALE L.J. 267, 268-69 (1946).

[2] *Id.* 268.

fortifying and prudent, if not heroic, to extend this introduction with a few deprecatory words. The business of the American trial courtroom seems to me in many ways to be instructive, creative, and sometimes even noble. As for the task of judging, it is nearly always a rich and satisfying challenge. The work produces fascinations and rewards that my imagination had failed to picture in advance. The trial court is a scene of drama, wit, humor, and humanity, along with the sorrows and the stretches of boredom. Even the periods of tedium are charged with the awareness of important stakes. There are daily choices that compel the judge to confront himself or herself, not less than those who will be affected, in stark and moving ways. There is power and there is, often more satisfying, the opportunity to forego the exercise of power.[3]

If I question the adequacy of our trial processes, it is not to serve the judges. It is to serve the ends of justice, for the furtherance of which all in our profession are commissioned. As is so often the case, Holmes said it better:

> I take it for granted that no hearer of mine will misinterpret what I have to say as the language of cynicism. . . . I trust that no one will understand me to be speaking with disrespect of the law, because I criticise it so freely. I venerate the law, and especially our system of law, as one of the vastest products of the human mind. . . . But one may criticise even what one reveres. Law is the business to which my life is devoted, and I should show less than devotion if I did not do what in me lies to improve it . . . .[4]

## I. The Judicial Perspective

My theme, to be elaborated at some length, is that our adversary system rates truth too low among the values that institutions of justice are meant to serve. Having worked for nine years at judging, and having evolved in that job the doubts and questions to be shared with you, I find it convenient to move into the

---

[3] *Cf.* C. Bok, I Too, Nicodemus 330 (1946).

[4] O.W. Holmes, *The Path of the Law*, in Collected Legal Papers 167, 194 (1920). The quotation was used in a similar setting by Judge Jerome Frank. J. Frank, Courts on Trial 3 (1950). As will be seen, this lecture follows in more pervasive respects positions urged in that engaging and valuable book. That the positions have not prevailed might discourage people more impatient than those who believe in the possibility of law reform.

subject with some initial reminders about our judges: who they are, how they come to be, and how their arena looks to them.

Except when we rely upon credentials even more questionable, we tend to select our trial judges from among people with substantial experience as trial lawyers. Most of us have had occasion to think of the analogy to the selection of former athletes as umpires for athletic contests. It may not press the comparison too hard to say it serves as a reminder that the "sporting theory"[5] continues to infuse much of the business of our trial courts. Reflective people have suggested from time to time that qualities of detachment and calm neutrality are not necessarily cultivated by long years of partisan combat.[6] Merely in passing, because it is not central to my theme, I question whether we are wise to have rejected totally the widespread practice in civil law countries of having career magistrates, selected when relatively young to function in the role of impartial adjudicators. Reserving a fuller effort for another time, I wonder now whether we might benefit from some admixture of such magistrates to leaven or test our trial benches of elderly lawyers.

In any event, our more or less typical lawyer selected as a trial judge experiences a dramatic change in perspective as he moves to the other side of the bench. It is said, commonly by judges, that "[t]he basic purpose of a trial is the determination of truth . . . ."[7] Justice David W. Peck identified "truth and . . . the right result" as not merely "basic" but "the sole objective of the judge . . . ."[8]

These are not questionable propositions as a matter of doctrine or logic. Trials occur because there are questions of fact. In principle, the paramount objective is the truth. Nevertheless, for the advocate turned judge this objective marks a sharp break with settled habits of partisanship. The novelty is quickly accepted because it has been seen for so long from the other side. But the novelty is palpable, and the change of role may be un-

---

[5] The phrase was undoubtedly a cliché when Roscoe Pound used it in a famous address in 1906. Pound, *The Causes of Popular Dissatisfaction with the Administration of Justice*, 29 ABA REP. 395, 404 (1906). Like other clichés, it still tells an important story. It also shares with many clichés the quality of referring to a widely known, deeply troublesome problem which has become entombed in a phrase so that it does not seem to require much active attention as a live concern.

[6] *See, e.g.*, B. SHIENTAG, THE PERSONALITY OF THE JUDGE 19 (1944) (3d Annual Benjamin N. Cardozo Lecture).

[7] Tehan v. United States *ex rel.* Shott, 382 U.S. 406, 416 (1966).

[8] D. PECK, THE COMPLEMENT OF COURT AND COUNSEL 9 (1954) (13th Annual Benjamin N. Cardozo Lecture).

settling. Many judges, withdrawn from the fray, watch it with benign and detached affection, chuckling nostalgically now and then as the truth suffers injury or death in the process.[9] The shop talk in judges' lunchrooms includes tales, often told with pleasure, of wily advocates who bested the facts and prevailed. For many other judges, however, probably a majority at one time or another, the habit of adversariness tends to be rechanneled, at least in some measure, into a combative yearning for truth. With perhaps a touch of the convert's zeal, they may suffer right- eously when the truth is being blocked or mutilated, turn against former comrades in the arena, feel (and sometimes yield to) the urge to spring into the contest with brilliant questions that light the way.

However the trial judge reacts, in general or from time to time, the bench affords a changed and broadened view of the adversary process. "Many things look different from the bench. Being a judge is a different profession from being a lawyer."[10] In the strictest sense I can speak only for myself, but I believe many other trial judges would affirm that the different perspec- tive helps to arouse doubts about a process that there had been neither time nor impetus to question in the years at the bar. It becomes evident that the search for truth fails too much of the time. The rules and devices accounting for the failures come to seem less agreeable and less clearly worthy than they once did. The skills of the advocate seem less noble, and the place of the judge, which once looked so high, is lowered in consequence. There is, despite the years of professional weathering that went before the assumption of the judicial office, a measure of disillu- sionment.

The disillusionment is, as I indicated at the outset, only a modest element of the judicial experience. It is relevant here, however. It accounts for recurrent judicial expressions that seem critical of the bar when they probably stem from more basic dissatisfactions. In any event, it is undoubtedly part of the genesis of this essay.

---

[9] As in the sentence just ended, this essay will be laced with general statements about matters of fact that are neither quantified nor tightly documented. These rest variously upon introspection, observation, reading, and conversations with fellow judges. They are believed to be accurate, but they are undoubtedly debatable in many instances.

[10] H. LUMMUS, THE TRIAL JUDGE 39 (1937). See also Medina, Some Reflections on the Judicial Function: A Personal Viewpoint, 38 A.B.A.J. 107 (1952).

## II. The Adversarial Posture

The preceding comments on the transition from bar to bench have touched explicitly upon the role of the advocate. That role is not, however, a matter of sharp and universally agreed definition. The conception from which this paper proceeds must now be outlined.

In a passage partially quoted above, Presiding Justice David W. Peck said:

> The object of a lawsuit is to get at the truth and arrive at the right result. That is the sole objective of the judge, and counsel should never lose sight of that objective in thinking that the end purpose is to win for his side. Counsel exclusively bent on winning may find that he and the umpire are not in the same game.[11]

Earlier, stating his theme that court and counsel "complement" each other, Justice Peck said:

> Unfortunately, true understanding of the judicial process is not shared by all lawyers or judges. Instead of regarding themselves as occupying a reciprocal relationship in a common purpose, they are apt to think of themselves as representing opposite poles and exercising divergent functions. The lawyer is active, the judge passive. The lawyer partisan, the judge neutral. The lawyer imaginative, the judge reflective.[12]

Perhaps unfortunately, and certainly with deference, I find myself leaning toward the camp the Justice criticized. The plainest thing about the advocate is that he is indeed partisan, and thus exercises a function sharply divergent from that of the judge. Whether or not the judge generally achieves or maintains neutrality, it is his assigned task to be nonpartisan and to promote through the trial an objective search for the truth. The advocate in the trial courtroom is not engaged much more than half the time—and then only coincidentally—in the search for truth. The advocate's prime loyalty is to his client, not to truth as such. All of us remember some stirring and defiant declarations by advocates of their heroic, selfless devotion to The

---

[11] D. Peck, *supra* note 8, at 9.
[12] *Id.* 7.

Client—leaving the nation, all other men, and truth to fend for themselves. Recall Lord Brougham's familiar words:

> [A]n advocate, in the discharge of his duty, knows but one person in all the world, and that person is his client. To save that client by all means and expedients, and at all hazards and costs to other persons, and, among them, to himself, is his first and only duty; and in performing this duty he must not regard the alarm, the torments, the destruction which he may bring upon others. Separating the duty of a patriot from that of an advocate, he must go on reckless of consequences, though it should be his unhappy fate to involve his country in confusion.[13]

Neither the sentiment nor even the words sound archaic after a century and a half. They were invoked not longer than a few months ago by a thoughtful and humane scholar answering criticisms that efforts of counsel for President Nixon might "involve his country in confusion."[14] There are, I think, no comparable lyrics by lawyers to The Truth.

This is a topic on which our profession has practiced some self-deception. We proclaim to each other and to the world that the clash of adversaries is a powerful means for hammering out the truth. Sometimes, less guardedly, we say it is "best calculated to getting out all the facts . . . ."[15] That the adversary technique is useful within limits none will doubt. That it is "best" we should all doubt if we were able to be objective about the question. Despite our untested statements of self-congratulation, we know that others searching after facts—in history, geography, medicine, whatever—do not emulate our adversary system. We know that most countries of the world seek justice by different routes. What is much more to the point, we know that many of the rules and devices of adversary litigation as we conduct it are not geared for, but are often aptly suited to defeat, the development of the truth.

We are unlikely ever to know how effectively the adversary technique would work toward truth if that were the objective of

---

[13] 2 Trial of Queen Caroline 8 (J. Nightingale ed. 1821).

[14] Freedman, *The President's Advocate and the Public Interest*, N.Y.L.J., Mar. 27, 1974, at 1, col. 1. Dean Freedman went on to explain that the system contemplates an equally single-minded "advocate on the other side, and an impartial judge over both." *Id.* 7, col. 2.

[15] D. Peck, *supra* note 8, at 9.

the contestants. Employed by interested parties, the process often achieves truth only as a convenience, a byproduct, or an accidental approximation. The business of the advocate, simply stated, is to win if possible without violating the law. (The phrase "if possible" is meant to modify what precedes it, but the danger of slippage is well known.) His is not the search for truth as such. To put that thought more exactly, the truth and victory are mutually incompatible for some considerable percentage of the attorneys trying cases at any given time.

Certainly, if one may speak the unspeakable, most defendants who go to trial in criminal cases are not desirous that the whole truth about the matters in controversy be exposed to scrutiny. This is not to question the presumption of innocence or the prosecution's burden of proof beyond a reasonable doubt. In any particular case, because we are unwilling to incur more than a minimal risk of convicting the innocent, these bedrock principles must prevail. The statistical fact remains that the preponderant majority of those brought to trial did substantially what they are charged with. While we undoubtedly convict some innocent people, a truth horrifying to confront, we also acquit a far larger number who are guilty, a fact we bear with much more equanimity.[16]

One reason we bear it so well is our awareness that in the last analysis truth is not the only goal. An exceedingly able criminal defense lawyer who regularly serves in our court makes a special point of this. I have heard him at once defy and cajole juries with the reminder that the question is not at all "guilt or innocence," but only whether guilt has been shown beyond a reasonable doubt. Whether that is always an astute tactic may be debated. Its doctrinal soundness is clear.

---

[16] One of our greatest jurists has observed:

"What bothers me is that almost never do we have a genuine issue of guilt or innocence today. The system has so changed that what we are doing in the courtroom is trying the conduct of the police and that of the prosecutor all along the line. Has there been a misstep at this point? at that point? You know very well that the man is guilty; there is no doubt about the proof. But you must ask, for example: Was there something technically wrong with the arrest? You're always trying something irrelevant. The case is determined on something that really hasn't anything to do with guilt or innocence. To the extent you are doing that to preserve other significant values, I think it is unobjectionable and must be accepted. But with a great many derailing factors there is either no moral justification or only a very minimal justification."

McDonald, *A Center Report: Criminal Justice*, THE CENTER MAGAZINE, Nov. 1968, at 69, 76 (remarks of Judge Walter V. Schaefer).

Whatever doctrine teaches, it is a fact of interest here that most criminal defense counsel are not at all bent upon full disclosure of the truth. To a lesser degree, but stemming from the same ethos, we know how fiercely prosecutors have resisted disclosure, how often they have winked at police lapses, how mixed has been their enthusiasm for the principle that they must seek justice, not merely convictions.[17] While the patterns of civil cases are different, and variable, we may say that it is the rare case in which either side yearns to have the witnesses, or anyone, give *the whole truth*. And our techniques for developing evidence feature devices for blocking and limiting such unqualified revelations.

The devices are too familiar to warrant more than a fleeting reminder. To begin with, we leave most of the investigatory work to paid partisans, which is scarcely a guarantee of thorough and detached exploration. Our courts wait passively for what the parties will present, almost never knowing—often not suspecting—what the parties have chosen not to present. The ethical standards governing counsel command loyalty and zeal for the client, but no positive obligation at all to the truth. Counsel must not knowingly break the law or commit or countenance fraud. Within these unconfining limits, advocates freely employ time-honored tricks and stratagems to block or distort the truth.

As a matter of strict logic, in the run of cases where there are flatly contradictory assertions about matters of fact, one side must be correct, the other wrong. Where the question is "Did the defendant pass a red light?" or "Does the plaintiff have a scarred retina?" or "Was the accused warned of the reasons why anyone of sound mind would keep quiet and did he then proceed nevertheless like a suicidal idiot to destroy himself by talking?" the "facts" are, or were, one way or the other. To be sure, honest people may honestly differ, and we mere lawyers cannot —actually, must not—set ourselves up as judges of the facts. That is the great release from effective ethical inhibitions. We are not to pass judgment, but only to marshal our skills to present and test the witnesses and other evidence—the skills being to make the most of these for our side and the least for the opposi-

---

[17] Among the most recent and highly publicized examples of prosecutors subordinating truth and fairness to the lust after victory are the dismissals of indictments in the Wounded Knee and Ellsberg cases. United States v. Banks, 383 F. Supp. 389 (D.S.D. 1974); United States v. Russo, No. 9373-CD-WMB (C.D. Cal., May 11, 1973).

tion. What will out, we sometimes tell ourselves and often tell others, is the truth. And, if worse comes to worst, in the end who really knows what is truth?

There is much in this of cant, hypocrisy, and convenient overlooking. As people, we know or powerfully suspect a good deal more than we are prepared as lawyers to admit or explore further. The clearest cases are those in which the advocate has been informed directly by a competent client, or has learned from evidence too clear to admit of genuine doubt, that the client's position rests upon falsehood. It is not possible to be certain, but I believe from recollection and conversation such cases are far from rare. Much more numerous are the cases in which we manage as counsel to avoid too much knowledge. The sharp eye of the cynical lawyer becomes at strategic moments a demurely averted and filmy gaze. It may be agreeable not to listen to the client's tape recordings of vital conversations that may contain embarrassments for the ultimate goal of vindicating the client. Unfettered by the clear prohibitions actual "knowledge" of the truth might impose, lawyers may be effective and exuberant in employing the familiar skills: techniques that make a witness look unreliable although the look stems only from counsel's artifice, cunning questions that stop short of discomfiting revelations, complaisant experts for whom some shopping may have been necessary. The credo that frees counsel for such arts is not a doctrine of truth-seeking.

The litigator's devices, let us be clear, have utility in testing dishonest witnesses, ferreting out falsehoods, and thus exposing the truth. But to a considerable degree these devices are like other potent weapons, equally lethal for heroes and villains. It is worth stressing, therefore, that the gladiator using the weapons in the courtroom is not primarily crusading after truth, but seeking to win. If this is banal, it is also overlooked too much and, in any event, basic to my thesis.

Reverting to the time before trial, our unlovely practice of plea bargaining—substantially unique to the United States —reflects as one of its incidents the solemn duty of defense counsel to seek the acquittal of guilty people. Plea negotiations must begin, in principles governing all but some exotic cases, with the understanding that the defendant is guilty. Plea negotiations should not otherwise be happening. But the negotiations break down in many cases, most often because

there is no mutually acceptable deal on the sentence, the key concern.[18] When that occurs, the defendant goes to trial, and the usual measures to prevent conviction are to be taken by his advocate. The general, seemingly principled, view would hold his tendered plea and attendant discussions inadmissible at trial.[19] Does all this make sense? Is it comfortable? All of us in the law have explained patiently to laymen that "guilty" means not simply that "he did it"; it means nothing less than that he has been "found-guilty-beyond-a-reasonable-doubt-by-a-unanimous-jury-in-accordance-with-law-after-a-fair-trial." Despite the sarcastic hyphens, all of us mean that and live by it. But when a fair trial entails a trial so tortured and obstacle-strewn as our adversary process, we make the system barely tolerable, if not widely admired, only by contriving that most of those theoretically eligible get no trial at all. The result suggests we might inquire how things work on the European continent, where the guilty plea, at least in technical strictness, is scarcely known and the plea bargain seems to be truly nonexistent.

Our relatively low regard for truth-seeking is perhaps the chief reason for the dubious esteem in which the legal profession is held. The temptation to quote poetical diatribes is great. Before fighting it off altogether, let us recall only Macaulay on Francis Bacon, purporting not to

> inquire . . . whether it be right that a man should, with a wig on his head, and a band round his neck, do for a guinea what, without those appendages, he would think it wicked and infamous to do for an empire; whether it be right that, not merely believing but knowing a statement to be true, he should do all that can be done by sophistry, by rhetoric, by solemn asseveration, by indignant exclamation, by gesture, by play of features, by terrifying one honest witness, by perplexing another, to cause a jury to think that statement false.[20]

Less elegant than Macaulay but also numbered among the laymen who do not honor us for our dealings with the truth are

---

[18] The discussion here applies quite generally, but not universally. "Sentence bargaining," probably a better label, is almost entirely unknown in the Southern District of New York. It happens with varying frequency in other federal courts—the Agnew case comes to mind, *cf.* Hoffman, *Plea Bargaining and the Role of the Judge*, 53 F.R.D. 499 (1971)—and appears to be widespread in the state courts of New York and elsewhere.

[19] *See* ABA PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, PLEAS OF GUILTY § 3.4 (Approved Draft (1968)).

[20] 6 T. MACAULAY, THE WORKS OF LORD MACAULAY 135, 163 (H. Trevelyan ed. 1900).

many beneficiaries of such stratagems. One of the least edifying, but not uncommon, of trial happenings is the litigant exhibiting a special blend of triumph, scorn, complicity, and moral superiority when his false position has scored a point in artful cross-examination or some other feat of advocacy. This is a kind of fugitive scene difficult to document in standard ways, but described here in the belief that courtroom habitués will confirm it from their own observations.

I am among those who believe the laity have ground to question our service in the quest for truth. The ranks of lawyers and judges joining in this rueful stance are vast. Many have sought over the years to raise our standards and our functioning, not merely our image. There has been success. Liberalized discovery has helped, though the struggles over that, including the well-founded fears of tampering with the evidence, highlight the hardy evils of adversary management. We have, on the whole, seemed to become better over time, occasional lapses notwithstanding. At any rate, the main object of this talk is not merely to bewail, but to participate in the ongoing effort to improve. Modest thoughts on that subject, respectively negative and positive, occupy the two sections that follow.

### III. Two Unpromising Approaches

Two means for controlling adversary excesses in the trial process are intervention by the judge and better training and regulation of counsel. Both have been proposed, and attempted to some extent. The second method is receiving serious attention today, with high and persuasive sponsorship. Neither of the two approaches, at least as they have been formulated thus far, contemplates any basic changes in the existing standards and procedures. For this central reason, neither seems to me to hold much promise.

#### A. *The Judge as Trial Director*

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.[21]

This observation has a clarion ring to the judicial ear. It is not inspiring to be a "mere" anything. The role of moderator is not

---

[21] Quercia v. United States, 289 U.S. 466, 469 (1933).

heady. The invitation from the highest court to play a doughtier part is instantly attractive. It has proved, however, to be a siren's call. The "not a mere moderator" slogan is cited as often as not in cases reversing trial judges for being less "mere" or moderate than they should be.[22] The fountainhead case from which the quotation comes was itself such a decision. The reversals seem, even to a trial judge, to be warranted most of the time.

The fact is that our system does not allow much room for effective or just intervention by the trial judge in the adversary fight about the facts. The judge views the case from a peak of Olympian ignorance. His intrusions will in too many cases result from partial or skewed insights. He may expose the secrets one side chooses to keep while never becoming aware of the other's. He runs a good chance of pursuing inspirations that better informed counsel have considered, explored, and abandoned after fuller study. He risks at a minimum the supplying of more confusion than guidance by his sporadic intrusions.

The ignorance and unpreparedness of the judge are intended axioms of the system. The "facts" are to be found and asserted by the contestants. The judge is not to have investigated or explored the evidence before trial. No one is to have done it for him. The judicial counterpart in civil law countries, with the file of the investigating magistrate before him, is a deeply "alien" conception. (That this should be so is a matter for doubt, stirred again later on. The relevant point for the moment is that it *is* so.) Without an investigative file, the American trial judge is a blind and blundering intruder, acting in spasms as sudden flashes of seeming light may lead or mislead him at odd times.

The ignorant and unprepared judge is, ideally, the properly bland figurehead in the adversary scheme of things. Because the parties and counsel control the gathering and presentation of evidence, we have made no fixed, routine, expected place for the judge's contributions. It is not a regular thing for the trial judge to present or meaningfully to "comment upon" the evidence. As a result, his interruptions are just that—interruptions; occasional, unexpected, sporadic, unprogrammed, and unduly dramatic because they are dissonant and out of character. The result—to focus upon the jury trial, the

---

[22] *E.g.*, United States v. Cisneros, 491 F.2d 1068, 1072-74 (5th Cir. 1974); United States v. Wyatt, 442 F.2d 858, 859-60 (D.C. Cir. 1971); Comer v. Smith's Transfer Corp., 212 F.2d 42, 47 (4th Cir. 1954); United States v. Brandt, 196 F.2d 653, 655 (2d Cir. 1952).

model for our system, including, of course, its rules of evidence—is that the judge's participation, whether in the form of questions or of comments, is likely to have a disproportionate and distorting impact. The jury is likely to discern hints, a point of view, a suggested direction, even if none is intended and quite without regard to the judge's efforts to modulate and minimize his role. Whether the jury follows the seeming lead or recoils from it is not critical.[23] The point is that there has been a deviant influence, justified neither in adversary principles nor in the rational competence of the trial judge to exert it.

We should be candid, moreover, in recognizing that juries are probably correct most of the time if they glean a point of view from the judge's interpolations. Introspecting, I think I have usually put my penetrating questions to witnesses I thought were lying, exaggerating, or obscuring the facts. Less frequently, I have intruded to rescue a witness from questions that seemed unfairly to put the testimony in a bad light or to confuse its import. Similar things appear in the reported decisions. The trial judge who takes over cross-examination seems to be hot on the scent after truth. Even the cold page conveys notes not wholly austere or detached. This would all be agreeable for a rational system of justice if there were grounds to suppose that the judge was always, or nearly always, on the right track. But there are not such grounds. The apparatus is organized to equip the judge poorly for the position of attempted leadership. Within the confines of the adversary framework, the trial judge probably serves best as relatively passive moderator.

This allows a scope far from trivial. The fair defining of the issues (sometimes, dubiously, described as "commenting" upon the evidence), the initial attempt to formulate sound rules of law, the effort to be intelligible to juries, and the general regulation of procedures are challenging enough to ward off boredom. But the questioning of witnesses and the expression of points of view, at least while the system of trial remains fundamentally as it is, are not generally desirable. More importantly, of course, the system needs changing. But while that is postponed or ignored, the trial judge does best to conform.

---

[23] "Notwithstanding a summing up which was favourable to the accused, the jury returned a verdict of guilty." R. CROSS, THE ENGLISH SENTENCING SYSTEM 12 (1971). The sentence was not meant ironically. The extensive power of the English trial judge to express views on the jury's ultimate questions is well known and distinctly not emulated among us. *See, e.g.,* P. DEVLIN, TRIAL BY JURY 118-20 (1956).

These self-denying observations mark a point of retreat, or at least change, from views I cherished in earlier days on the bench. I started with a robust distaste for the image of the judge as umpire. I am not yet reconciled to it utterly. I still butt in, probably more than counsel would prefer, but far less than I used to. The reason is not growing modesty, a trait not necessarily strengthened by service as a judge. Quite to the contrary, experience has suggested that my interjections are not on the whole vitally necessary or useful or principled. Reminded from time to time that I have not been duly prepared by advance exposure to or investigation of the facts, I am more likely of late to suggest lines of inquiry to counsel than to launch them independently. This, too, may change; it is where I stand now for the reasons stated.

The note of uncertainty is obviously justified, not least because I find myself uncomfortably at odds in this with some of our greatest trial judges. One in particular, Judge Charles E. Wyzanski, Jr., dealt with the subject in a notable Cardozo Lecture. When he spoke in 1952, he offered a modest but variable formula for the trial judge's participation in jury trials, the variations to depend upon the nature of the case.[24] The experience and wisdom of the intervening years have led Judge Wyzanski in a direction opposite from mine, to the position that the trial judge ought to be considerably more active, in criminal jury trials as well as other things. His vivid reflection of the change was part of a recent lecture in which he told about a federal charge of resisting an officer brought against a black man in circumstances deemed severely questionable by Judge Wyzanski. He said:

> [T]he case was tried before me and a jury. In my charge to the jury, I made it perfectly plain that in my view the wrong persons had been indicted. The jury was unable to agree on a verdict.
>
> The case has recently come before another judge of the trial court; and Perkins was convicted. Now I am not saying, don't misunderstand me, that I was right and the other judge was wrong. I am merely pointing out the terrific significance of what Judge Shientag, a

---

[24] Wyzanski, *A Trial Judge's Freedom and Responsibility*, 65 HARV. L. REV. 1281, 1283-93 (1952), proposing that the trial judge be generally passive in tort cases; more directive in commercial litigation, where judges are more likely to "have a specialized knowledge," *id.* 1288; and forbearing again in criminal cases short of the point of sentencing.

> very able judge of New York ... called *The Personality of the Judge*. There is a terrific importance in the trial court, never equaled in any appellate court, of knowing who is the judge.[25]

To make certain Judge Wyzanski was expressing a belief that judges *should* act as he described, not merely that they do, I took the liberty of writing and asking. In a charming letter saying a number of important and poetical things, he assured me that the position outlined in his Cardozo Lecture has indeed changed, that the above quoted account now describes his practice, and that he is "confessedly more activist today than [he] was a quarter of a century ago."[26] So there is, if it is needed, the highest kind of authority opposing my position.

Having strained to that agony of fairness, let me end this topic with the contention for here and now that the trial judge as a participant is likely to impair the adversary process as frequently as he improves it. What is more vital to my thesis is that the critical flaw of the system, the low place it assigns to truth-telling and truth-finding, is not cured to any perceptible degree by such participation.[27]

### B. *Education and Certification of Trial Lawyers*

Led by the energetic Chief Justice of the United States, there is a substantial body of opinion favoring improved training

---

[25] Wyzanski, *An Activist Judge: Mea Maxima Culpa. Apologia Pro Vita Mea*, 7 GA. L. REV. 202, 208 (1973).

[26] Letter from Judge Charles E. Wyzanski, Jr., to Judge Marvin E. Frankel, June 11, 1973. For a broader argument favoring judicial activism, see Wyzanski, *Equal Justice Through Law*, 47 TUL. L. REV. 951 (1973).

[27] It is scarcely possible to leave this subject without at least a passing reference to Watergate and the work of Judge John J. Sirica. Having acknowledged that, I think it sufficient to say that nothing in the fantastic Washington trials alters what has been said here as it applies to the great bulk of cases. Whatever kind of law, if any, is made by great cases, the recent affirmance of the conviction of George Gordon Liddy was taken as an occasion to reaffirm that the trial judge usually does best to refrain from acting as interrogator. The unanimous court of appeals said, "Sound and accepted doctrine teaches that the trial judge should avoid extensive questioning of the witness and should rely on counsel to develop testimony for the jury's consideration." United States v. Liddy, No. 73-1565, at 21 (D.C. Cir., Nov. 8, 1974). Similarly, "Past decisions have stressed that in general the trial judge would do better to forego direct questioning, and the possible impact on his objectivity, since he has available the alternative of suggesting to counsel the questions he believes ought to be pursued." *Id.* at 21 n.31. The court went on to acknowledge that the case before it was one "of moment in both the daily press and history." *Id.* at 25. Having determined in that setting that "[t]he impact of the extensive questioning by the trial judge was muted," *id.* at 22, the court concluded, "Assuming for discussion that the problems already noted reflect error by the trial judge, it must be ranked as harmless rather than prejudicial error." *Id.* at 25.

and, probably, certification requirements for trial and appellate advocates. There are evident interconnections between that project and my theme.

Along with others, the Chief Justice has experienced "anxieties . . . concerning the quality of advocacy in our courts."[28] There is, he observes, an unfilled "need for skilled courtroom advocacy with a special emphasis on the administration of criminal justice."[29] Illustrating the deficiencies of the trial bar, he notes such points as:

(1) Insufficient skill in "the seemingly simple but actually difficult art of asking questions . . . ."

(2) Failure to learn "really . . . the art of cross-examination, including the high art of when not to cross-examine."

(3) The tendency of inexperienced lawyers to "waste time making wooden objections to simple, acceptable questions, on uncontested factual matters."

(4) The tendency, again in inexperienced lawyers, to be "unaware that 'inflammatory' exhibits such as weapons or bloody clothes should not be exposed to jurors' sight until they are offered in evidence."

(5) Wasteful development of immaterial facts.[30]

More broadly, the Chief Justice is concerned with "the failure of lawyers to observe the rules of professional manners and professional etiquette that are essential for effective trial advocacy."[31]

Turning to cures, Chief Justice Burger proposes better education and a licensing process. The law schools, he says, have been deficient, first, in teaching "the necessity of high standards of professional ethics, manners and etiquette as things basic to the lawyer's function."[32] Second, there is a lack of "adequate and systematic programs by which students may focus on the elementary skills of advocacy."[33] He joins those urging a reduction of the curriculum from three years to two, and then, for aspiring advocates, a clinical year in which they would "concentrate on what goes on in courtrooms . . . under the guidance of practitioners along with professional teachers."[34] Accentuating the

---

[28] Burger, *The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?*, 42 FORDHAM L. REV. 227 (1973).

[29] *Id.*

[30] *Id.* 234-35.

[31] *Id.* 235.

[32] *Id.* 232.

[33] *Id.*

[34] *Id.*

practical, he stresses that "trial advocacy must be learned from trial advocates."[35] At the end of his program for reform, he sees that "[s]ome system of specialist certification is inevitable,"[36] and he urges broad collaboration to produce "a workable and enforceable certification of trial advocates."[37]

Chief Judge Kaufman of the Second Circuit has been thinking along the same lines. He sees advocates and judges as "partners" in the quest for justice, and believes that "the quality of justice dispensed by the courts is ultimately dependent on the quality of advocacy provided by the bar."[38] He, too, finds grave defects in this quality, summarizing them as "lack of experience, lack of competence, and lack of integrity."[39] He joins in the view that "[e]xperienced members of the bar are well suited to assist in teaching the art of advocacy."[40] He joins also in looking to certification as a likely means of improvement.[41] And, with characteristic decision, Chief Judge Kaufman has named a committee of lawyers and judges that has already forced out six drafts of implementing rules that would govern admission to federal district court bars. The rules would require, *inter alia*, some service as courtroom apprentice or observer following graduation from a law school program that included a "trial advocacy course." The prescribed course would be one "in which the students, under supervision of a member of the bar in simulated or actual litigation participate in various phases of trial work. Supervision must have been provided by lawyers who are familiar with litigation."[42]

Without opposing altogether the drive toward "clinical" training and certification, I am moved to deep skepticism. If, as I increasingly believe, the "art of advocacy" exhibits too much that is artful and not enough devotion to justice, how far should our law schools go in teaching it? Note in the list of subjects offered illustratively by the Chief Justice that the "arts" leading all the rest are those of "asking questions" and of "cross-examination, including the high art of when not to cross-examine." Consider to what a degree these arts consist in tailoring direct questions

---

[35] *Id.*
[36] *Id.* 238.
[37] *Id.* 241.
[38] Kaufman, *The Court Needs a Friend in Court*, 60 A.B.A.J. 175 (1974).
[39] *Id.* 176.
[40] *Id.* 177.
[41] *Id.* 178.
[42] Proposed Rule of Admission to Fed. Dist. Cts. C(3) (2d Cir. Qualifications Comm. 6th Draft 1974).

that will produce not the whole of the sprawling and unmanageable truth, but the portrayal that is most convenient and useful. All of us as advocates have sat in vital strategy sessions figuring out whether to ask a particular question or how to ask it so that the answer would be a properly controlled flow or trickle rather than a destructive geyser. Consider similarly the proportions in which truth-seeking vies with obfuscation in the techniques of the cross-examiner. Recall, in the Chief Justice's own words, how much the adversary artist is "engaged in the destruction of adverse witnesses or undermining damaging evidence,"[43] all with habitual unconcern whether the "adverse witnesses" are truthful or the enemy's evidence is causing deserved damage. Recall the last time you saw a negligence lawyer and a "plaintiff's" or "defendant's" physician going at each other, and ask how keen their professional schools would have been to claim credit for these performances. (It must be observed, at least parenthetically, that the Chief Justice expressed skepticism about the adversary system long ago. There is reason to infer that his proposals for improving advocates reflect a realistic estimate that the system we have, like it or not, is destined to endure for a while.)[44]

---

[43] Burger, *supra* note 28, at 236.

[44]      Judge Burger's initial statement—which criticized the adversary system of criminal justice and questioned the strength of some cornerstones of that system—became a kind of thesis around which the dialogue pivoted and developed:

> I raise this question, [Burger said,] and I will overstate it to try to evoke a challenging response. I say that the adversary system is not the best system of criminal justice, and that there is a better way. Many of us tend to think that while our adversary system may be inefficient, it is still the best that could have been devised. I challenge that proposition. The system is certainly inefficient and wasteful. I am not sure it is the best that could be devised. The American system, up to the time of the final verdict and appeal, puts all the emphasis on techniques, devices, mechanisms. It is the most elaborate system ever devised by a society. It is so elaborate that in many places it is breaking down. It is not working.

Judge Burger explained what he meant by techniques, devices, and mechanisms. They include the presumption that the accused is innocent; the use of juries and the consequent rules regarding evidence; the right of the defendant to remain silent; the placing of the burden of proof on the prosecution. McDonald, *supra* note 16, at 69.

[Burger stated further:]

> The British system and ours are both adversary in the highest sense of the word. Both are accusatory, very contentious. The reason why the British system works so much better is that only a highly trained professional trial lawyer—a barrister—is permitted to try a case in a court of general jurisdiction in important criminal cases. There are

While Chief Judge Kaufman complains, no doubt justly, about a portion of the Second Circuit's bar, who are said to file "late and oversized briefs . . . appendixes that ignore the . . . Rules . . ." and, in addition, perpetrate "miscitations, misstatements of fact, and missed points,"[45] I would submit that the professional skills of *appellate* advocacy are actually taught well and truly in our decent law schools. Over and over again, we see students handling themselves with grace and distinction in appellate moot courts. For the essential components of the appellate lawyer's work are intellectual: scholarship, professional skills of analysis, some rhetorical talent perhaps, and sound judgments of value and policy. All this, if it is to be effective, organized with candor as well as artistry. These are matters fit for the precincts of a university. If Chief Judge Kaufman's clinical prescriptions were confined to the appellate level, they might augur a happy collaboration of the bar and the academy.

Trial advocacy is quite another thing. It is not taught well in the law schools when there is any attempt to teach it at all. The wiles, the stratagems, the dodges, the histrionics—the "arts" —are, in large measure, outside the bounds of scholarly discourse. They are too frequently outside of other bounds that should hedge a law school's proper work.

The legal academies have been well advised in resisting attempted controls like those in the draft changes of admissions rules for the federal courts. They should approach with max-

---

only about two thousand barristers in all England but they can try a case in a fourth the time ours take. There is none of the inter-barrister wrangling or objections that we have. Also, British judges have greater power and greater professionalism. To become a judge in Britain a man must be a barrister first. Then he goes to the trial bench. And all the Appellate judges are drawn from the trial bench.

I hope I am making it clear that I do not want simply an efficient system that convicts more people. My settlement point would be the British system, which, though highly adversary, is handled entirely by skilled professionals. But beyond and apart from efficiency, I think the system in some of the northern European countries is more humane. It is fairer across the board than it is in our country. I would suppose that a system of criminal justice ought to be judged by these three questions: Is it fair? Is it humane? Is it efficient? I put efficiency last.

In our system, a trial is a traumatic experience for everybody involved—the judge, the prosecutor, the defense counsel, and most of all for the defendant, whether he be guilty or innocent. It is not anything like that in Holland or Denmark. The American system puts a premium on skill, adroitness, even trickery, on both sides.

*Id.* 75.

[45] Kaufman, *supra* note 38, at 176.

imum wariness the invitation to form teams with "experienced" nonacademics for "courses in advocacy." The things in which advocates are experienced may or may not belong in the curriculum. The skills of advocates do not necessarily entail or include the ability to teach or the promise of inspiring example.

As we contemplate, with justifiable pride, the recent splendor of our many great law schools, it remains useful to remember Veblen's scornful observation that "the law school belongs in the modern university no more than a school of fencing or dancing."[46] If that comment was ever justified, it has not been in recent years. Still, one may ask how much fencing and dancing might fairly be injected into the curriculum without adding merit to Veblen's disdain.

Instead of welcoming the opportunity to aid in the "certification" process, our legal scholars must eye this bandwagon from their accustomed postures of doubt and criticism. Broadly speaking, the law schools have done far too little close, intensive scrutiny of the adversary process with a view to its improvement and modification in the public interest. The renewed exaltation of "advocacy" as the stuff of courses is a convenient challenge and opportunity. The main thing is for the law schools to see themselves as guides and teachers, not followers, of the profession. In that light, they must first determine for themselves how much of what advocates do is worth doing and how much may be unworthy or evil for the public interest. It will be time enough after that to decide how and how far the law schools should seek to fashion "clinical legal education programs . . . looking to the training of advocates."[47]

I would add only a few thoughts at this point on the troublesome topic of "ethics, manners and civility in the courtroom"[48] and, more broadly, on "integrity."[49] As to the aspects of these words directed mainly to etiquette, the problem seems to me, with all deference, to be essentially minor. A few celebrated cases have made headlines. For the most part, however, the manners of trial lawyers have seemed admirable to me, especially considering that we train them to be in combat so much of their trial time. My own experience of nine years, for what it signifies,

---

[46] T. VEBLEN, THE HIGHER LEARNING IN AMERICA 155 (1957).
[47] Kaufman, *supra* note 38, at 177.
[48] Burger, *supra* note 28, at 230.
[49] Kaufman, *supra* note 38, at 176.

suggests that a judge quite lacking the air of command, but armed with our ancient traditions and a few marshals, rarely fails to find himself working in a safe and orderly place.[50]

As for the more basic matters of "ethics" and "integrity," only limited achievements may be expected from "courses in advocacy" or other efforts to teach virtue as such. Our ethical rules being what they are, the effective "teaching" of them is not a program of great promise. It is the rules themselves and the fundamental premises inspiring them that need reexamination.

As for the genuine concerns of thoughtful people like the Chief Justice and our Chief Judge, the need, I submit, is to reconsider our principles, not their teaching or application. In a system that so values winning and deplores losing, where lawyers are trained to fight for, not to judge, their clients, where we learn as advocates not to "know" inconvenient things, moral elegance is not to be expected. The morals of the arena and the morals of the marketplace, notwithstanding the aspirations of the extraordinary soul to whom these lectures are dedicated, tend powerfully to shape our conduct.

As for advocates specifically, the rule is essentially that they must not "knowingly" use "fraudulent, false, or perjured testimony"[51] or "[k]nowingly engage in other illegal conduct . . . ."[52] These are not sufficient rules for charting a high road to justice. The lawyer's capacity for ignorance is large. The proscriptions defining the "illegal" are narrow. The prohibitions, ethical or disciplinary, are under a canon telling the lawyer to *"represent a client zealously within the bounds of the law."*[53] And the proscription of fraud and illegality is under an italicized heading proclaiming the *"Duty of the Lawyer to the Adversary System of Justice,"*[54] not to the Truth or to Justice *simpliciter*.

Let us by all means stress ethics and seek to uplift ourselves. But let us not build our hopes for the system on a breed of lawyers and judges much better or worse than mere human beings. If we limit our fantasies in this respect, we will not expect that better rules of warfare are apt to produce peace and cooperative crusades for justice.

---

[50] *Cf.* B. Botein, Trial Judge 33 (1963); N. Dorsen & L. Friedman, Disorder in the Court 6-9 (1973).

[51] ABA Code of Professional Responsibility EC 7-26; DR 7-102 (A)(4), (5).

[52] *Id.* DR 7-102 (A)(8).

[53] *Id.* Canon 7.

[54] *Id.* (heading preceding EC 7-19).

## IV.  SOME PROPOSALS

Having argued that we are too much committed to contentiousness as a good in itself and too little devoted to truth, I proceed to some prescriptions of a general nature for remedying these flaws. Simply stated, these prescriptions are that we should:

(1) modify (not abandon) the adversary ideal,
(2) make truth a paramount objective, and
(3) impose upon the contestants a duty to pursue that objective.

### A.  *Modifying the Adversary Ideal*

We should begin, as a concerted professional task, to question the premise that adversariness is ultimately and invariably good. For most of us trained in American law, the superiority of the adversary process over any other is too plain to doubt or examine. The certainty is shared by people who are in other respects widely separated on the ideological spectrum. The august *Code of Professional Responsibility*, as has been mentioned, proclaims, in order, the *"Duty of the Lawyer to a Client,"*[55] then the *"Duty of the Lawyer to the Adversary System of Justice."*[56] There is no announced "Duty to the Truth" or "Duty to the Community." Public interest lawyers, while they otherwise test the law's bounds, profess a basic commitment "to the adversary system itself" as the means of giving "everyone affected by corporate and bureaucratic decisions . . . a voice in those decisions . . . ."[57] We may note similarly the earnest and idealistic scholar who brought the fury of the (not necessarily consistent) establishment upon himself when he wrote, reflecting upon experience as devoted defense counsel for poor people, that as an advocate you must (a) try to detroy a witness "whom you know to be telling the truth," (b) "put a witness on the stand when you know he will commit perjury," and (c) "give your client legal advice when you have reason to believe that the knowledge you give him will tempt him to commit perjury."[58] The "policies" he found to

---

[55] *Id.* (heading preceding EC 7-4).
[56] *Id.* (heading preceding EC 7-19).
[57] Halpern & Cunningham, *Reflections on the New Public Interest Law*, 59 GEO. L.J. 1095, 1109 (1971).
[58] Freedman, *Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions*, 64 MICH. L. REV. 1469 (1966).

justify these views, included, as the first and most fundamental, the maintenance of "an adversary system based upon the presupposition that the most effective means of determining truth is to present to a judge and jury a clash between proponents of conflicting views."[59]

Our commitment to the adversary or "accusatorial" mode is buttressed by a corollary certainty that other, alien systems are inferior. We contrast our form of criminal procedure with the "inquisitorial" system, conjuring up visions of torture, secrecy, and dictatorial government. Confident of our superiority, we do not bother to find out how others work. It is not common knowledge among us that purely inquisitorial systems exist scarcely anywhere; that elements of our adversary approach exist probably everywhere; and that the evolving procedures of criminal justice, in Europe and elsewhere, are better described as "mixed" than as strictly accusatorial or strictly inquisitorial.[60]

In considering the possibility of change, we must open our minds to the variants and alternatives employed by other communities that also aspire to civilization. Without voting firmly, I raise the question whether the virginally ignorant judge is always to be preferred to one with an investigative file. We should be prepared to inquire whether our arts of examining and cross-examining, often geared to preventing excessive outpourings of facts, are inescapably preferable to safeguarded interrogation by an informed judicial officer.[61] It is permissible to keep asking, because nobody has satisfactorily answered, why our present system of confessions in the police station versus no confessions at all is better than an open and orderly procedure of having a judicial official question suspects.[62]

If the mention of such a question has not exhausted your tolerance, consider whether our study of foreign alternatives might suggest means for easing the unending tension surrounding the privilege against self-incrimination as it frequently operates in criminal trials. It would be prudent at least to study closely whether our criminal defendant, privileged to stay sus-

---

[59] Id. 1470. See also id. 1471, 1477-78, 1482.

[60] W. Schaefer, The Suspect and Society 71 (1967); Damaska, Evidentiary Barriers to Conviction and Two Models of Criminal Procedure: A Comparative Study, 121 U. Pa. L. Rev. 506, 557-61, 569-70 (1973).

[61] Cf. Watts v. Indiana, 338 U.S. 49, 54-55 (1949).

[62] See W. Schaefer, supra note 60; cf. Friendly, The Fifth Amendment Tomorrow: The Case for Constitutional Change, 37 U. Cin. L. Rev. 671, 685, 700-01, 713-16 (1968).

1054        *UNIVERSITY OF PENNSYLVANIA LAW REVIEW*    [Vol. 123:1031

piciously absent from the stand or to testify subject to a perjury prosecution or "impeachment" by prior crimes, is surely better off than the European defendant who cannot escape questioning both before and at trial, though he may refuse to answer, but is free to tell his story without either the oath or the impeachment pretext for using his criminal record against him.[63] Whether or not the defendant is better off, the question remains open whether the balance we have struck is the best possible.

To propose only one other topic for illustration, we need to study whether our elaborate struggles over discovery, especially in criminal cases, may be incurable symptoms of pathology inherent in our rigid insistence that the parties control the evidence until it is all "prepared" and packaged for competitive manipulation at the eventual continuous trial. Central in the debates on discovery is the concern of the ungenerous that the evidence may be tainted or alchemized between the time it is discovered and the time it is produced or countered at the trial. The concern, though the debaters report it in differing degrees, is well founded. It is significant enough to warrant our exploring alternative arrangements abroad where investigation "freezes" the evidence (that is, preserves usable depositions and other forms of relatively contemporaneous evidence) for use at trial, thus serving both to inhibit spoilage and to avoid pitfalls and surprises that may defeat justice.[64]

Such illustrative lines of study and comparison are tendered here only as the beginning of a suggested agenda. For myself, I plan to go back to law school with them by proposing their consideration as topics for seminars I shall be privileged to

---

[63] *See* Damaska, *supra* note 60, at 527-28.

[64] In the depths of the cold war, Mr. Justice Jackson reported a comparison that should be no more offensive in a time of even tremulous détente:

[T]he Soviet Delegation objected to our practice on the ground that it is not fair to defendants. Under the Soviet System when an indictment is filed every document and the statement of every witness which is expected to be used against the defendant must be filed with the court and made known to the defense. It was objected that under our system the accused does not know the statements of accusing witnesses nor the documents that may be used against him, that such evidence is first made known to him at the trial too late to prepare a defense, and that this tends to make the trial something of a game instead of a real inquest into guilt. It must be admitted that there is a great deal of truth in this criticism. We reached a compromise by which the Nurnberg indictment was more informative than in English or American practice but less so than in Soviet and French practice.

Bull, *Nurnberg Trial*, 7 F.R.D. 175, 178 (n.d.) (quoting Justice Jackson, source not indicated).

"give" (more aptly, to share) during the coming year. It is my hope that some of those who read this may wish to embark upon comparable efforts.

### B.  *Making Truth the Paramount Objective*

We should consider whether the paramount commitment of counsel concerning matters of fact should be to the discovery of truth rather than to the advancement of the client's interest. This topic heading contains for me the most debatable and the least thoroughly considered of the thoughts offered here. It is a brief suggestion for a revolution, but with no apparatus of doctrine or program.

We should face the fact that the quality of "hired gun"[65] is close to the heart and substance of the litigating lawyer's role. As is true always of the mercenary warrior, the litigator has not won the highest esteem for his scars and his service. Apart from our image, we have had to reckon for ourselves in the dark hours with the knowledge that "selling" our stories rather than striving for the truth cannot always seem, because it is not, such noble work as befits the practitioner of a learned profession. The struggle to win, with its powerful pressures to subordinate the love of truth, is often only incidentally, or coincidentally, if at all, a service to the public interest.

We have been bemused through the ages by the hardy (and somewhat appealing) notion that we are to serve rather than judge the client. Among the implications of this theme is the idea that lawyers are not to place themselves above others and that the client must be equipped to decide for himself whether or not he will follow the path of truth and justice. This means quite specifically, whether in *Anatomy of a Murder*[66] or in Dean Freedman's altruistic sense of commitment,[67] that the client must be armed for effective perjury as well as he would be if he were

---

[65] *See* H. PACKER & T. EHRLICH, NEW DIRECTIONS IN LEGAL EDUCATION 33 (1972).

[66] R. TRAVER, ANATOMY OF A MURDER (1958). For those who did not read or have forgotten it, the novel, by a state supreme court justice, involved an eventually successful homicide defense of impaired mental capacity with the defendant supplying the requisite "facts" after having been told in advance by counsel what type of facts would constitute the defense.

[67] *See* text accompanying note 58 *supra*. In M. FREEDMAN, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM, ch. 6 (forthcoming), Dean Freedman reports a changed view on this last of his "three hardest questions." He would under some circumstances (including the case in *Anatomy of a Murder*) condemn the lawyer's supplying of the legal knowledge to promote perjury. Exploring whether the Dean's new position is workable would transcend even the wide leeway I arrogate in footnotes.

himself legally trained. To offer anything less is arrogant, elitist, and undemocratic.

It is impossible to guess closely how prevalent this view may be as a practical matter. Nor am I clear to what degree, if any, received canons of legal ethics give it sanction. My submission is in any case that it is a crass and pernicious idea, unworthy of a public profession. It is true that legal training is a source of power, for evil as well as good, and that a wicked lawyer is capable of specially skilled wrongdoing. It is likewise true that a physician or pharmacist knows homicidal devices hidden from the rest of us. Our goals must include means for limiting the numbers of crooked and malevolent people trained in the vital professions. We may be certain, notwithstanding our best efforts, that some lawyers and judges will abuse their trust. But this is no reason to encourage or facilitate wrongdoing by everyone.

Professional standards that placed truth above the client's interests would raise more perplexing questions. The privilege for client's confidences might come in for reexamination and possible modification. We have all been trained to know without question that the privilege is indispensable for effective representation. The client must know his confidences are safe so that he can tell all and thus have fully knowledgeable advice. We may want to ask, nevertheless, whether it would be an excessive price for the client to be stuck with the truth rather than having counsel allied with him for concealment and distortion. The full development of this thought is beyond my studies to date. Its implications may be unacceptable. I urge only that it is among the premises in need of examination.

If the lawyer is to be more truth-seeker than combatant, troublesome questions of economics and professional organization may demand early confrontation. How and why should the client pay for loyalties divided between himself and the truth? Will we not stultify the energies and resources of the advocate by demanding that he judge the honesty of his cause along the way? Can we preserve the heroic lawyer shielding his client against all the world—and not least against the State—while demanding that he honor a paramount commitment to the elusive and ambiguous truth? It is strongly arguable, in short, that a simplistic preference for the truth may not comport with more fundamental ideals—including notably the ideal that generally values individual freedom and dignity above order and efficiency in

government.[68] Having stated such issues too broadly, I leave them in the hope that their refinement and study may seem worthy endeavors for the future.

### C. *A Duty to Pursue the Truth*

The rules of professional responsibility should compel disclosures of material facts and forbid material omissions rather than merely proscribe positive frauds. This final suggestion is meant to implement the broad and general proposition that precedes it. In an effort to be still more specific, I submit a draft of a new disciplinary rule that would supplement or in large measure displace existing disciplinary rule 7-102 of the *Code of Professional Responsibility*.[69] The draft says:

> (1) In his representation of a client, unless prevented from doing so by a privilege reasonably believed to apply, a lawyer shall:
>> (a) Report to the court and opposing counsel the existence of relevant evidence or witnesses where the lawyer does not intend to offer such evidence or witnesses.
>> (b) Prevent, or when prevention has proved

---

[68] Two previous Cardozo Lecturers have been among the line of careful thinkers cautioning against too single-minded a concern for truth. "While our adversary system of litigation may not prove to be the best means of ascertaining truth, its emphasis upon respect for human dignity at every step is not to be undermined lightly in a democratic state." Botein, *The Future of the Judicial Process*, 15 RECORD OF N.Y.C.B.A. 152, 166 (1960). *See also* Shawcross, *The Functions and Responsibilities of an Advocate*, 13 RECORD OF N.Y.C.B.A. 483, 498, 500 (1958).

[69] The affected portions of DR 7-102 are:

(A)   In his representation of a client, a lawyer shall not:

. . . .

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

(4) Knowingly use perjured testimony or false evidence.

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

. . . .

(B)   A lawyer who receives information clearly establishing that:

(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal.

(2) A person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal.

unsuccessful, report to the court and opposing counsel the making of any untrue statement by client or witness or any omission to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

(c) Question witnesses with a purpose and design to elicit the whole truth, including particularly supplementary and qualifying matters that render evidence already given more accurate, intelligible, or fair than it otherwise would be.

(2) In the construction and application of the rules in subdivision (1), a lawyer will be held to possess knowledge he actually has or, in the exercise of reasonable diligence, should have.

Key words in the draft, namely, in (1)(b), have been plagiarized, of course, from the Securities and Exchange Commission's rule 10b-5.[70] That should serve not only for respectability; it should also answer, at least to some extent, the complaint that the draft would impose impossibly stringent standards. The morals we have evolved for business clients cannot be deemed unattainable by the legal profession.

Harder questions suggest themselves. The draft provision for wholesale disclosure of evidence in litigation may be visionary or outrageous, or both. It certainly stretches out of existing shape our conception of the advocate retained to be partisan. As against the yielding up of everything, we are accustomed to strenuous debates about giving a supposedly laggard or less energetic party a share in his adversary's litigation property safeguarded as "work product."[71] A lawyer must now surmount partisan loyalty and disclose "information clearly establishing" frauds by his client or others.[72] But that is a far remove from any duty to turn over all the fruits of factual investigation,[73] as the

---

[70] 17 C.F.R. § 240.10b-5 (1974).

[71] See 4 J. MOORE, FEDERAL PRACTICE ¶ 26.64 (2d ed. 1974).

[72] ABA CODE OF PROFESSIONAL RESPONSIBILITY, DR 7-102(B).

[73] Cf. AMERICAN COLLEGE OF TRIAL LAWYERS, CODE OF TRIAL CONDUCT R. 15(b): A lawyer should not suppress any evidence that he or his client has a legal obligation to reveal or produce. He should not advise or cause a person to secrete himself or to leave the jurisdiction of a tribunal for the purpose of making himself unavailable as a witness therein. However, except when legally required, it is not his duty to disclose any evidence or the identity of any witness.

draft proffered here would direct. It has lately come to be required that some approach to helpful disclosures be made by prosecutors in criminal cases; "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[74] One may be permitted as a respectful subordinate to note the awkward placement in the quoted passage of the words "upon request," and to imagine their careful insertion to keep the duty of disclosure within narrow bounds. But even that restricted rule is for the *public* lawyer. Can we, should we, adopt a far broader rule as a command to the bar generally?

That question touches once again the most sensitive nerve of all. A bar too tightly regulated, too conformist, too "governmental," is not acceptable to any of us. We speak often of lawyers as "officers of the court" and as "public" people. Yet our basic conception of the office is of one essentially private—private in political, economic, and ideological terms—congruent with a system of private ownership, enterprise, and competition, however modified the system has come to be.[75] It is not necessary to recount here the contributions of a legal profession thus conceived to the creation and maintenance of a relatively free society. It *is* necessary to acknowledge those contributions and to consider squarely whether, or how much, they are endangered by proposed reforms.

If we must choose between truth and liberty, the decision is not in doubt. If the choice seemed to me that clear and that stark, this essay would never have reached even the tentative form of its present submission. But I think the picture is quite unclear. I lean to the view that we can hope to preserve the benefits of a free, skeptical, contentious bar while paying a lesser price in trickery and obfuscation.

---

[74] Brady v. Maryland, 373 U.S. 83, 87 (1963).
[75] *Cf.* Damaska, *supra* note 60, at 565-69, 584-87.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
(Docket Number PENDING completion of filing)

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
New Jersey Superior Court Judge Ana C. Viscomi et al

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
Cardinal Tobin et al

Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman v.
Dr. Derek Santiago et al

---

EXHIBIT, Tuesday, February 24,2026 marked,

" United States District Court for the Southern District of New York
Judge Marvin E. Frankel, "The Search for Truth: An Umperial View".
University of Pennsylvania Law Review"  Volume 123, May 1975,
Number 5, Pages 1031-1059"
========================================================

COMPLETE VALID COMPY THEREOF
==============================

As to the Defense, the Protection, the Support of the Libel
against the good name, against the good reputation, against
the high esteem all heard by the Plaintiff Pro Se herein,
Dr. Stephen Francis Schoeman all his nearly, alas, so,
nearly EIGHT-FOUR YEARS OF LIFE, now tragically so, in
THE DARKENING DUSK OF LIFE and what with his several
LIFE-TAKING DISEASES that is fully fulling maintained to beat
the band, so to speak, to a fault, so to speak, in excess evil,
so to speak, by the DEFENSE COUNSEL herein and their
DEFENDANT CLIENTS herein and which as been and, alas,
also tragically so, is causing extreme damage to the health
not only of Dr. Schoeman but of his co-plaintiff his beloved and
loving wife, best friend, soulmate, and co-plaintiff Mrs. Joyanne
Louise Schoeman, each the extraordinarily proud parent of their
beloved and loving and ever so very extremely tremendously
gigantically adorable miniautre apricot poodle PIERRE HENRI
as has been caused, and as is being causes, alas, ever so
tragically so, by the torment, the torture, the legalistic means
and the legalistic ways of these very same DEFENSE ATTORNEYS
and, of course as well, their DEFENDANT CLIENTS herein and
therein, respectively:
====================

===========
MID-L-8679-25 re Viscomi et al
UNN-L-4376-25 re Tobin et al
UNN-L-4961-25 re Santiago et al
==============================

# IMPEACHMENT OF JUDGE ANA C. VISCOMI

From:  sschoeman@verizon.net (sschoeman@verizon.net)

To:     aury.quezada@njcourts.gov; jaclyn.berry@njcourts.gov; aoc-acjcinfo.mbx@njcourts.gov

Cc:     sdavis@newjerseylaw.net; jvigliotti@summitlawyers.net; jisola@cgajlaw.com

Bcc:    steven.budelman@njcourts.gov; jason.saunders@njcourts.gov; macrina.carra@njcourts.gov;
        vtovar@westfieldnj.gov

Date:   Tuesday, February 24, 2026, 11:04 AM EST


TODAY, Tuesday, late morning, February 24,2026
_____


NEW JERSEY GENERAL ASSEMBLY UNDER ITS IMPEACHMENT POWERS
================================================================

FROM: Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman
        The Plaintiffs Pro Se, MID-L-8679-25
        101 Jefferson Avenue
        Westfield, New Jersey 07090
        (908) 654-4144

TO: DEFENDANT HEREIN Superior Court of New Jersey Judge Ana C. Viscomi
     DEFENDANTS herein DEFENSE COUNSEL herein
     ALL the  DEFENDANT CLIENTS herein

          By our AMENDED COMPLAINTS herein!
          ++++++++++++++++++++++++++++++++
Upon advice of counsel, should Superior Court Judge Ana C. Viscomi
NOT RECUSE HERSELF and proceeding with her MOTION HEARING
scheduled for this Thursday, February 26,2026,

regretfully, sadly, unhappily IMPEACHMENT PROCEEDINGS MUST for
all the reasons herein BE COMMENCED FORTHWITH!

For there can never ever be DEFIANCE at all of THE JUST RULE OF
LAW JUSTLY APPLIED!
================================================================
MOST RESPECTFUL CAVEAT: Any untoward act or word at all and the
Plaintiffs Pro Se on advise of counsel shall be placed in the unenviable
and dire and ever so very painful place of having to be forced to take
yet further LEGAL ACTION in, of course, the form of LAWSUIT or
LAWSUITS as the case may prove to be in LITIGATION before a
JURY or JURIES of PEERS!

Case 2:26-cv-01827-MCA-JSA     Document 5     Filed 03/02/26     Page 56 of 59 PageID: 92

=====================================================================

With all due respect, ACT ACCORDINGLY SO, PLEASE

# IMPEACHMENT OF JUDGE ANA C. VISCOMI

From: sschoeman@verizon.net (sschoeman@verizon.net)

To:    aury.quezada@njcourts.gov; jaclyn.berry@njcourts.gov; aoc-acjcinfo.mbx@njcourts.gov

Cc:    sdavis@newjerseylaw.net; jvigliotti@summitlawyers.net; jisola@cgajlaw.com

Bcc:   steven.budelman@njcourts.gov; jason.saunders@njcourts.gov; macrina.carra@njcourts.gov;
       vtovar@westfieldnj.gov

Date:  Tuesday, February 24, 2026, 11:04 AM EST


TODAY, Tuesday, late morning, February 24,2026
_____


NEW JERSEY GENERAL ASSEMBLY UNDER ITS IMPEACHMENT POWERS
==============================================================


FROM: Dr. and Mrs. Stephen Francis and Joyanne Louise Schoeman
      The Plaintiffs Pro Se, MID-L-8679-25
      101 Jefferson Avenue
      Westfield, New Jersey 07090
      (908) 654-4144

TO: DEFENDANT HEREIN Superior Court of New Jersey Judge Ana C. Viscomi
    DEFENDANTS herein DEFENSE COUNSEL herein
    ALL the DEFENDANT CLIENTS herein

        By our AMENDED COMPLAINTS herein!
        ++++++++++++++++++++++++++++++++++

Upon advice of counsel, should Superior Court Judge Ana C. Viscomi
NOT RECUSE HERSELF and proceeding with her MOTION HEARING
scheduled for this Thursday, February 26,2026,

regretfully, sadly, unhappily IMPEACHMENT PROCEEDINGS MUST for
all the reasons herein BE COMMENCED FORTHWITH!

For there can never ever be DEFIANCE at all of THE JUST RULE OF
LAW JUSTLY APPLIED!
==============================================================
MOST RESPECTFUL CAVEAT: Any untoward act or word at all and the
Plaintiffs Pro Se on advise of counsel shall be placed in the unenviable
and dire and ever so very painful place of having to be forced to take
yet further LEGAL ACTION in, of course, the form of LAWSUIT or
LAWSUITS as the case may prove to be in LITIGATION before a
JURY or JURIES of PEERS!

Case 2:26-cv-01827-MCA-JSA    Document 5    Filed 03/02/26    Page 58 of 59 PageID: 94

=========================================================

With all due respect, ACT ACCORDINGLY SO, PLEASE

FedEx

Envelope

Recycle me

UNITED STATES DISTRICT COURT OF *
50 WALNUT ST
NEWARK NJ 07102

S:M6C6   630

GG8333032016 4277
T08485 XLE A503-3 FEB 28 05:36:05 2026
1764 UOC 25.9 SATOLR
PK6
0030-MFL

SHIP CLERK MLK JR FEDERAL COURTHOUSE
TO: UNITED STATES DISTRICT COURT OF NJ
50 WALNUT ST

NEWARK   NJ 07102-3551

NJ 076 9-0



UPS GROUND
TRACKING #: 1Z GG8 333 03 2016 4277

BILLING: P/P

REF #2: E.0

MMX965658XJE7 ISH 13.00C ZZP 450 05.5U 01/20

PRIORITY OVERNIGHT
258-1068

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

RECEIVED

Align bottom of peel-and-stick airbill or pouch he